[L. A. No. 8290. In Bank.—July 30, 1925.]

In the Matter of the Estate of MARGARET JOLLY, Deceased. CATHERINE CAVANAUGH et al., Appellants, v. SARAH REA et al., Respondents.

[1] ESTATES OF DECEASED PERSONS—CHARACTER OF PROPERTY LEFT—EVIDENCE—PRESUMPTIONS.—In a contest between the heirs at law of a deceased husband and the heirs at law of the subsequently deceased wife as to whether the property, real and personal, ordered distributed in the estate of the wife was the separate property of the wife or the community property of the husband and wife, in weighing the evidence consideration must be given to all the well-established presumptions of law affecting the acquisition or the possession of real and personal property by the spouses during coverture and the increase thereof, as well as property found in the possession of the survivor, in the light of the circumstances appearing in the case.

[2] ID.—COMMUNITY PROPERTY—DISPUTABLE PRESUMPTION—EVIDENCE. The disputable presumption, raised by virtue of the provision of section 164 of the Civil Code, that "all other property acquired after marriage by either husband or wife, or both, . . . is community property," is a form of evidence under section 1957 of the Code of Civil Procedure, and, while it may be controverted by other evidence, direct or indirect, unless so controverted, the court or jury is bound to find according to the presumption.

[3] ID.—PROPERTY ACQUIRED AFTER MARRIAGE—COMMUNITY STATUS—REBUTTAL OF PRESUMPTION.—The presumption of the wife's community interest in property acquired after marriage can be overcome only by the production of clear and satisfactory proof that the property in question was the separate property of the wife.

[4] ID.—STATUS OF PROPERTY LEFT BY SURVIVING WIFE—EVIDENCE—INFERENCES.—In this contest between the heirs at law of a de-

---

2.  See 5 Cal. Jur. 293, 311.
3.  See 5 Cal. Jur. 329.

ceased husband and wife as to whether the property ordered distributed in the estate of the subsequently deceased wife was the separate property of the wife or the community property of the husband and wife, every possible method or means by which the property in question could have been acquired by the wife subsequent to the husband's death was stipulated out of the case, except the bare possibility of gift, devise, bequest, or descent, and there was no evidence tending to show or presumption of law tending to support a claim that she acquired any property in the four ways or means last mentioned, and, from the situation of the parties before marriage, an inference of fact arose that the wife did not possess or own any property whatever before or at the time of marriage, and the estate was, therefore, accumulated during coverture.

[5] ID.—CLOSE OF LONG MARITAL RELATION—PRESUMPTION AS TO PROPERTY.—The property in the possession of one of the spouses at the close of a long marital relation must be presumed to be community property unless a better right can be established by the spouse claiming it to be his or her separate property.

[6] ID.—DEATH OF HUSBAND—SUBSEQUENT CONVEYANCES TO WIFE—PRESUMPTION.—The presumption applicable to conveyances to the wife during coverture cannot be applied to conveyances to the wife several years after the death of the husband.

[7] ID.—PURCHASE OF PROPERTY WITH COMMUNITY FUNDS.—The fact that community property is sold and other property bought with the proceeds, or that such property is exchanged for other property, does not change the original character of the property; its character is determined by reference to the nature of the funds with which it is purchased, and so long as its source can be traced it retains the character of that source.

(1) 4 C. J., p. 847, n. 11 New; 31 C. J., p. 53, n. 47. (2) 22 C. J., p. 83, n. 54; 31 C. J., p. 49, n. 3, p. 50, n. 11, p. 53, n. 47. (3) 31 C. J., p. 52, n. 42. (4) 31 C. J., p. 53, n. 47. (5) 31 C. J., p. 48, n. 82. (6) 31 C. J., p. 48, n. 90. (7) 31 C. J., p. 37, n. 72.

APPEAL from an order of the Superior Court of San Diego County ordering distribution of an estate. W. P. Cary, Judge. Reversed.

The facts are stated in the opinion of the court.

F. L. Richardson for Appellants.

5. See 5 Cal. Jur. 313.
7. See 5 Cal. Jur. 294.

Sweet, Stearns & Forward, Hamilton & Lindley and Richard M. Kew for Respondents.

SEAWELL, J.—This is a contest between the heirs at law of John Jolly and Margaret Jolly, husband and wife, both deceased, as to whether the property, real and personal, ordered distributed, was the separate property of Margaret Jolly or was the community property of John Jolly and his said wife, Margaret. No children were born as the issue of the marriage. The judge of the probate court found that John Jolly died on or about the eleventh day of February, 1912, leaving no estate whatever, and that Margaret Jolly died intestate on April 4, 1922, leaving as her separate estate, the property in controversy, consisting of real property of the value of $9,000 and money in bank and other personal property of the value of about $19,418.90, and accordingly ordered that distribution of the whole of said estate be made to the heirs at law of said Margaret Jolly to the exclusion of the heirs of said predeceased husband, John Jolly. The appeal is taken from that order. It is the claim of appellants that the estate is the community property of said marriage and one-half thereof should be distributed to the heirs at law of John Jolly and the other half to the heirs of Margaret Jolly, as provided by section 1386, subdivision 8 of the Civil Code.

The evidence in the case as to many of the material facts ordinarily provable in this class of cases was not as fully developed as might be desired and therefore the determination of the issue must rest largely upon legal presumptions and inferences arising from the uncontradicted facts of the case. No evidence was offered by respondents tending to impeach the claim of the heirs at law of John Jolly, except two deeds of real property conveying certain lots in the city of San Diego to Margaret Jolly, executed in the years 1918, 1922, respectively. These conveyances were made a number of years after the death of the husband, John Jolly, and within four and two years, respectively, prior to the death of Margaret.

The depositions of Peter Jolly and Mary Duffy, brother and sister, respectively, of John Jolly, deceased, were received in evidence. These depositions furnish some assistance in determining the question as to the period in which

the property inventoried as the separate property of the estate of Margaret Jolly was acquired. A determination of the issue is also aided by the law of presumptions as defined by sections 163 and 164 of the Civil Code. The history of the marriage of John Jolly and his wife (formerly Margaret Downey) and the situation of said parties at the time of and subsequent to said marriage, as detailed by the two witnesses at the hearing, is necessary for the application of the rules of law which we think must control the decision.

The evidence shows that the parents of both spouses were near neighbors, residing at Cleator Moor, England, where John Jolly and Margaret Downey spent their earlier years. Margaret's father died in her early girlhood, leaving the mother, apparently, as the breadwinner. Some mention is made of a sister and a brother, but the evidence indicates that the two last referred to were not permanently residing with Margaret and the mother. The mother conducted a jerry which received the patronage of the miners working in the near-by districts. The patronage was small. A jerry is described as a beer or ale inn. The evidence would indicate that the family was not in prosperous circumstances. Neither the mother nor daughter owned any real property or possessed any money or personal property aside from household effects of humble character. John Jolly, then a young man, resided with his parents. His father's family consisted of a number of children, male and female, in addition to the heads of the family. John was a young miner, doing contract work in conjunction with his father and a brother, in the mines of the neighborhood, and was earning a comfortable wage. He was also interested with his sister in conducting a hostelry. The evidence would not support an inference that either he or the family owned property of great value. John and other members of the family visited Margaret and her mother at the jerry where, it would seem, occasional social dances were given. A long story may be shortened by the statement that the tryst made at Cleator Moor, England, was consummated by marriage in America. At the time Margaret and her mother departed from Cleator Moor, the former was of the age of about twenty-four years. She and her mother located at or near Philadelphia, Pennsylvania. A check-up of events would fix their arrival in America on a day within the year 1870.

John Jolly followed her to this country about one year thereafter. They were joined in wedlock at Philadelphia shortly following his arrival. The only evidence to be found in the record on the subject tends to show that John was a man of unusual earning ability and that he was sturdy and frugal in his habits, industrious, a good and dependable workman, and had saved quite a sum of money before he left England for this country. The couple resided for a time at or near Johnstown, Pennsylvania. John was engaged in working in the mining districts of Pennsylvania. Afterward they went to Illinois, then to Virginia City, Nevada. He arrived at Virginia City in the early seventies. At that time the gold mining industry was at its height. He worked as foreman and miner in the Comstock gold mines of Nevada for a period of about twenty years. He commanded good wages, receiving as much as $9 per day. Peter Jolly, whose deposition was read at the hearing, was a brother of John and his junior by thirteen years. He came to this country nine years after John's arrival, and visited the brother's wife, Mrs. Margaret Jolly, at Virginia City, in 1882. He, too, was a miner. John was at this time mining near Hawthorne, about 100 miles from Virginia City. The wife told him that John sent her his pay check each month. She also stated that all she had was his earnings; that John was working steady, and they were getting along as he was making "big money" as a miner. Peter did not see his brother John, as the wife advised him not to go to Hawthorne, as her husband was then working but one man in the mine and it would be unwise for him to make the trip. The inference is that she did not wish to have the brothers meet. She gave him $80 when he departed, after sojourning at Virginia City for about six weeks.

John and Peter met for the last time in 1911, at which time Peter visited him at San Diego, California. John was residing there with his wife. They owned their home and were comfortably situated. Peter did not make any inquiries into their financial affairs, but testified that his brother was then retired and was living comfortably and had the appearance of being in easy circumstances. He and his wife discussed in his presence the advisability of making a loan on certain real property. The amount of the mortgage was not named in the conversation. John Jolly died the fol-

lowing year, February 11, 1912.  The record is silent as to what property he owned at the time of his death or what disposition was made of his estate at the time of or prior to his demise.  The widow died ten years thereafter, April 4, 1922, leaving in her own name the estate in controversy, all of which was personal property, except a few parcels of realty, situated in San Diego, acquired by her August 8, 1918, and January 11, 1922, respectively, aggregating $9,000. The entire estate was appraised at $28,418.95.

Counsel in the case stipulated as follows: ". . . at the time of his (John Jolly's) death he and Margaret Jolly were husband wife and that after his death Margaret Jolly did not engage in any occupation and was in a poor condition of health from the date of the death of John Jolly until her own death and not able to work."

The record contains affirmative evidence to the effect that Margaret Jolly had at no time before or after marriage ever engaged in any business or occupation or performed any duties except household or domestic duties in her mother's family and in her marital relation.  It does not appear that she ever owned or possessed a separate estate or an independent income from any source whatsoever or that she had acquired any property by gift, devise, bequest, or descent.

After John Jolly's arrival in this country he seldom communicated with his parents, who later followed the children to this country, or with his brothers and sisters.  But a few letters passed between him and the other members of his father's family.  Peter and Mrs. Duffy account for this dearth of correspondence on the theory that letters mailed to John were intercepted by the wife and did not reach him. According to their testimony she was not inclined to establish intimate relations with other members of the family.

[1]  The probate court found from the facts herein narrated that it was not true, as claimed by the heirs of John Jolly, that the property ordered distributed was accumulated subsequent to the marriage of the said parties, or that it was community property, but, on the contrary, found that the said John Jolly left no estate whatever at the time of his death and that there was no community property belonging to either spouse at the time of his death and that all of the property owned by the said Margaret Jolly or found in her

possession at the time of her death was her separate prop-
erty and estate.   The question, therefore, is whether the evi-
dence sustains the conclusion reached by the probate court,
to wit, that all of said property was the separate estate of
Margaret Jolly.   In weighing the evidence consideration
must be given to all of the well-established presumptions of law
affecting the acquisition or the possession of real and per-
sonal property by the spouse during coverture and the in-
crease thereof, as well as property found in the possession
of the survivor, in the light of the circumstances appearing
in each particular case.   [2]   That portion of section 164
of the Civil Code which prescribes the rules of presumptions
in community property cases provides as follows: "All other
property acquired after marriage by either husband or wife,
or both, . . . is community property."

"The disputable presumption raised by section 164 of the
Civil Code is a form of evidence under the express terms
of section 1957 of the Code of Civil Procedure.   It may
be controverted by other evidence, direct or indirect, but
unless so controverted the court or jury is bound to find
according to the presumption."   (*Stafford* v. *Martinoni,* 192
Cal. 724 [221 Pac. 919].)

"The community [property] generically embraces all
property belonging to the spouses, except such as the statute
specifically removes from its operation.   Community prop-
erty is the rule, separate property the exception thereto.
Hence the presumption . . . follows . . . "   (Ballinger on
Community Property, p. 213.)

"No evidence of sufficient strength was adduced at the
trial to overcome the presumption created by section 164
of the Civil Code. . . .   [3]   The presumption of the wife's
community interest in property acquired after marriage can
be overcome only by the production of clear and satisfactory
proof that the property in question was the separate prop-
erty of the wife."   (*Estate of Rolls,* 193 Cal. 594 [226 Pac.
608] ; see, also, *Dimmick* v. *Dimmick,* 95 Cal. 326 [30 Pac.
547] ; *Rowe* v. *Hibernia Sav. & Loan Soc.,* 134 Cal. 403 [66
Pac. 569] ; *Freese* v. *Hibernia Sav. & Loan Soc.,* 139 Cal.
392 [73 Pac. 172] ; 5 Cal. Jur. 311–313.)

[4]   It will be remembered that every possible method
or means by which the property in question could have been
acquired by the wife since the husband's death has been stipu-

lated out of the case except the bare possibility of gift, devise, bequest, or descent. There is no evidence tending to show or presumption of law tending to support a claim that she acquired any property in the four ways or means last above mentioned, and from the situation of the parties before marriage an inference of fact arises that the wife did not possess or own any property whatever before or at the time of marriage, and that the estate was, therefore, accumulated during coverture. Any other inference would be untenable under the uncontradicted evidence in the case. John Jolly and his wife Margaret enjoyed a matrimonial companionship for a period of about forty years. They had no children and the husband was an industrious, capable miner of economical habits, and, as before stated, it nowhere appears that the wife possessed or owned any separate estate before or after marriage. The fact would seem to be that she and the mother were in poor circumstances. Valuable property was found in her possession at the close of a span of life of about seventy-five years in duration, forty years of which were passed in the marital state and the last ten years in widowhood, broken in health. Admittedly, she engaged in no occupation during the latter period of her life. Under the affirmative evidence of the case, aided by the usual presumptions of law and with no evidence offered to overcome said presumptions, we must conclude that the estate ordered distributed to the heirs of Margaret Jolly as her separate property was the community property of said Margaret Jolly and her predeceased husband. The rule dominating the situation before us is well stated by the text in 31 C. J. 47, as follows: ''Since the very basic conception of the community property system is that it is a species of partnership between a husband and wife, whereby they are to share equally in the benefit and enjoyment of the results of their joint or separate industry, labor and earning capacity, and, accordingly, 'separate property' is defined in terms necessarily making it an exception to the usual estate held by the members of the community, every inquiry as to whether particular property belongs to the community, or to the separate estate of one or the other members thereof, begins with a *prima facie* presumption that it belongs to the former, especially where the matrimonial union has continued for a considerable length of time. . . . The burden of

overcoming the general presumption in favor of the community is upon the party asserting separate ownership; . . ."
Respondents insist that there is no evidence showing that the property was acquired during coverture. Admitting that there is no direct evidence on the question, but indirect or circumstantial only, this does not strengthen the weakness of respondents' position, as there is neither evidence of any kind nor presumptions nor inferences to support the conclusion that the property was acquired as separate property. [5] The property in the possession of one of the spouses at the close of a long marital relation must be presumed to be community unless a better right can be established by the spouse claiming it to be his or her separate property.

Respondents take the position that in order for the presumption of section 164 of the Civil Code to apply it must be shown by direct evidence that the property was *acquired during coverture;* that is to say, it is not sufficient in the absence of any evidence whatever as to the character of the property to show merely that it was in the possession of the spouse during marriage unless the circumstances of its possession are such as to definitely indicate the character of the property upon the death of the other. Our attention has been called to no case in this state where this precise question has been passed upon. "Acquired" and "possessed" are used rather interchangeably in many of the decisions of this court. It must be admitted, however, that in all of the cases of this state in which the word "possession" was used as synonymous with "acquired" the facts were that the property actually came to either spouse during coverture. The *Estate of Bollinger,* 170 Cal. 381 [149 Pac. 995], presents such an example. (See, also, 5 Cal. Jur. 311, 312.) While the law strongly favors the indulgence of the presumption of community interest under ordinary circumstances of coverture, we do not think it necessary to extend the presumption prescribed by section 164 of the Civil Code beyond the language of the section, for the reason that the conclusion compelled in the instant case by the process of elimination and by the force of indirect evidence forecloses any other conclusion but the sole one that the estate is not shown to be the separate estate of either spouse and must for the reasons herein assigned be regarded as community property.

The respondents failed to meet the burden of proof which the law casts upon them.

[6] Respondents place emphasis on the fact that certain real property was purchased by the wife in 1918 and 1922. The grantee in those conveyances was the wife, the husband having been dead some years prior to the execution of said conveyances. This is not such a transaction as is dealt with in *Fanning* v. *Green,* 156 Cal. 279 [104 Pac. 308], or other cases in which one of the spouses deeded to the other or where one is made the grantee by a third party during coverture. Here there was but one surviving spouse, therefore the rule announced in those cases cannot be applied to the facts of the present case. From what we have said as to the character of the property it must follow that the realty purchased by the wife since the death of the husband must have been purchased with community funds. [7] The fact that community property is sold and other property bought with the proceeds, or that such property is exchanged for other property, does not change the original character of the property; its character is determined by reference to the nature of the funds with which it is purchased, and so long as its source can be traced it retains the character of that source. (5 Cal. Jur. 294.) The funds or property that purchased the realty in question can only be traced to a community source.

The order distributing the whole of the estate to the heirs of Margaret Jolly is hereby reversed.

Shenk, J., Richards, J., Waste, J., Lawlor, J., Lennon, J., and Myers, C. J., concurred.

Rehearing denied.