## NEECE v. DURST et al. *
### No. 6697.

Circuit Court of Appeals, Ninth Circuit.

Nov. 3, 1932.

*Rehearing denied January 9, 1933.

Swaffield & Swaffield, Kenneth Sperry, and Joseph E. Madden, all of Long Beach, Cal., for appellant.

William W. Fry and Ernest U. Schroeter, both of Los Angeles, Cal., for appellees.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a decree adjudging the appellee, as trustee, to be the owner of five parcels of Los Angeles county land and entitled to all rents and profits accruing from four of the parcels, including oil royalties from one of the tracts.

The bill of complaint, filed June 11, 1929, alleges the adjudication in bankruptcy of George W. Neece to have been entered on July 16, 1928; that the bankrupt estate showed no assets whatsoever; and that the liabilities are about $45,000. It is further alleged that, since the marriage of the bankrupt to E. Louise Neece, the appellant herein, on November 13, 1894, the bankrupt has engaged in the real estate business, has ac-

quired various parcels of property, and, as far back as 1904, has caused the legal title to such property to be vested in his wife, without any consideration to himself, all "for the sole purpose of hindering, delaying and defrauding" his creditors; and that, at the time of the adjudication in bankruptcy, he held the equitable title to the five parcels here in issue, as follows:

Parcel I: Lot 4 of block 46 of the re-subdivision of part of Alamitos Beach townsite, in Long Beach.

Parcel II: An undivided one-half interest in and to lots 3 and 4 of the Webber tract, a subdivision of a portion of a farm lot, 61, American Colony tract.

Parcel III: Lot 12 in block 11 of replat of sheet No. 1, of the Back Bay tract No. 1.

Parcel IV: Lots 23 and 24 of Riverside plat No. 2, in Long Beach.

Parcel V: Lots 9 and 10 in block 23, Lots 36 and 37 in block 18; lots 35 and 36 in block 30; and lots 26, 27, and 28 in block 33, all in tract 5992.

In connection with parcel V, the bill alleges that on May 11, 1925, the bankrupt made a fraudulent conveyance of a 4 per cent. beneficial interest in trust No. 399 of the Long Beach Branch of the Security Trust & Savings Bank, to the appellant under distribution of which she became vested with legal title to parcel V. The transcript shows that the distribution was effected by corporation grant deeds dated October 18, 1928.

The legal title of each of the five parcels in question at the time of the adjudication in bankruptcy was in the name of the appellant, according to the bill of complaint.

In connection with parcel II, it is alleged that the appellant is receiving certain oil royalties from the Texas Company under a lease agreement covering lots 3 and 4 of the Webber tract, which said royalties are equitably owned by the bankrupt.

The complaint sets forth that all of the real and personal property in issue was accumulated by the bankrupt since his marriage, and is community property, "subject to be sold and applied in satisfaction of" the bankrupt's debts.

The defendant, the Texas Company, was joined by reason of its interest in an oil lease covering parcel II, as stated above, and it is alleged that said defendant was making royalty payments to the appellant.

Injunctions to restrain the further making of such royalty payments and to restrain the transfer of any of the real and/or personal property in issue are prayed for.

The defendant, May A. Carson, the appellant's sister, was joined because it was alleged that the appellant, after the adjudication in bankruptcy, had executed a grant deed in favor of the said defendant, conveying to the latter the legal title to parcel III, with intent to hinder, delay, or defraud the bankrupt's creditors.

In their answer, the defendant bankrupt and his wife deny that the properties in question are or were equitably owned by the bankrupt, or that they constitute community property; and, as a separate defense, they allege a gift of property known as 1027 Elm avenue, Long Beach, by the bankrupt to the appellant as her separate property, and that the properties now standing in her name were acquired by investment and reinvestment of the proceeds derived from the Elm avenue property, as well as of money and property inherited by her.

Hearing was had under an order of reference. On July 11, 1930, the special master filed, as one document, his report, findings of fact, and conclusions of law. The master in his report called attention to instances of fraud on the bankrupt's part, and found that the various parcels in question and the said royalties constituted the community property of the bankrupt and the appellant, and that the title thereto passed to the appellee as of the date of adjudication in bankruptcy. Exceptions to the report were filed by the appellant. Findings of fact and conclusions of law were filed by the District Court on February 10, 1931. The lower court confirmed the master's report, and, on the same day, entered the decree that is the subject of the present appeal.

A number of related matters were adjudicated in the decree, but, in the language of the appellant's counsel, "the only question * * * to be determined under these assignments [of error] is whether the evidence is sufficient to sustain the findings of the lower Court and of the special master that the properties in question were community property at the time of the adjudication in bankruptcy of George W. Neece."

The master's report covers exactly 100 printed pages. It contains a detailed and exhaustive analysis of not only the transactions involving the parcels of land in question, but also numerous prior transactions of the bankrupt and the appellant. Some attention was given by the master to the question of fraud, partly as shedding light upon the

question of intent and hence upon the ultimate question of whether or not the property in controversy is community property and subject to be applied to the satisfaction of the bankrupt's debts.

We have carefully read the master's report and the briefs, which briefs cover 270 printed and typewritten pages, and which set forth in detail much of the evidence, and have examined goodly portions of the 700-page transcript of record. We will not attempt, however, to detail the multitudinous and intricate real estate transactions, but will limit ourselves to adverting to a few of their more significant features.

The lower court observed that "the decision of the master was arrived at not so much from the oral testimony as from a scrutiny of transactions shown by the records running through a period of many years." The appellee seems to hold a similar view, since he says that: "We need but to scan through the special master's report, to ascertain why he made his decision largely upon the documentary evidence, rather than upon the oral, uncorroborated testimony of appellant and bankrupt."

At the same time, there was considerable testimony, and we are not prepared to say that the master should not have been influenced by some of it. In any event, as we will point out later, some of the oral evidence is extremely pertinent on the question of fraud.

The appellant concedes that it is "a well recognized rule of law * * * that in cases of a conflict in the evidence, the findings of the lower Court will be upheld." The rule applies to bankruptcy proceedings. In Remington on Bankruptcy (4th Ed.) vol. 8, § 3871, p. 224, we find the following statement: "The judgment of the Court below on the facts will not be disturbed unless clearly against the weight of the evidence or unless plain and manifest error exists." (Many cases cited and quoted.)

This same presumption of correctness can be invoked to sustain the findings of the lower court as to community property, according to an article in the 1930 Calif. Juris. Supplement, § 57, p. 86: "The sufficiency of the evidence is generally a matter for the trial Court or jury, and the findings or verdict will not be lightly set aside. If the evidence be conflicting, the Appellate Court will not interfere to set aside the determination of the trial judge or jury."

The nunc pro tunc order of reference discloses that the referee, as special master, was ordered to "hear, try and determine all issues in this case, and thereafter make report of his findings of fact and conclusions of law thereon to the Court. * * *" In the annotation under the section from Remington, quoted above, we find, on page 227, the following statement: "And it is especially true that the reviewing courts will not disturb findings of facts except for manifest error, where both the referee and the district judge have coincided."

There is conflict in the evidence in the instant case, and we believe that there is sufficient evidence to sustain the findings and conclusions of the master and of the District Court.

For example, there was conflict even between various portions of the appellant's own testimony. We quote from the transcript:

"As I remember it, when I got the $2,000 on the mortgage on the 1027 Elm Avenue property, I used that money to repay the loan I made from the bank. * * *

"Q. What did you do with the difference of $700 between what you claim you purchased this interest in this acreage on Anaheim Street for, and the amount you mortgage [d] the Elm Street [sic] property for? A. Didn't I say I was not positive about those transactions? * * * Your Honor, I think, as I remember it, I think I got the mortgage of about $1,300. I can't remember that the mortgage was $2,000."

Again the appellant on one occasion testified as follows: "Q. Now, Mrs. Neece, did you ever receive any property of [or] money other than this Elm Street [sic] property from your husband? A. No."

When Mrs. Neece was questioned about this testimony on "cross examination" by her own counsel, the following colloquy ensued:

"Q. * * * Do you wish to correct that answer, Mrs. Neece? A. Yes, I did receive presents from him, and things of that sort.

"Q. Well, the word 'property' there in that question is all-inclusive, both real and personal property. A. Well, I did."

Even if we assume the correctness of the appellant's position that, "where the complainant calls the defendant as a witness in a federal equity proceeding, he is estopped to deny the credibility of such witness and is bound by his testimony unless controverted by other evidence," we find that the very authorities cited by her hold that in such cases the complainant can always show the

defendant was "mistaken" or that the defendant's testimony was "self-contradictory or inherently improbable." Standard Water Systems Co. et al. v. Griscom-Russell Co. (C. C. A. 3) 278 F. 703, 704, certiorari denied, 259 U. S. 580, 42 S. Ct. 464; 66 L. Ed. 1073; United States v. Barber Lumber Co. (C. C. Idaho) 172 F. 948, 962, affirmed by this court, 194 F. 24.

Furthermore, as we examine the testimony of the appellant, we are struck by the number of times at which she expressed herself as being unable to remember details of the transactions in which she had been interested. While we prefer to draw no inference from this save that the appellant's knowledge or memory was lacking, we assuredly do not feel prepared to hold that the master was not warranted in rejecting her theory of the case.

And this theory has been shifted during the course of the litigation. In the answer filed by her and the bankrupt, it was alleged: "That all of the real and personal property described in complainant's bill of complaint was acquired by defendant, E. Louise Neece, as her own separate property and estate, as a result of the acquisition by her of said 1027 Elm Avenue, and the funds and moneys derived therefrom, and the funds, moneys and property derived from the investment and reinvestment thereof, coupled with moneys acquired by the defendant E. Louise Neece by inheritance, and also by moneys borrowed by her, and each and all of said properties are now and at all times mentioned in said complainant's bill of complaint have been the sole and separate property and estate of the defendant, E. Louise Neece."

Similar allegations are to be found in the appellant's affidavit on order to show cause for injunction pendente lite. One of these allegations deals with the source of money that she is said to have lent to her husband.

But in its opening brief the appellant states that "the fact that the purchase price is community property is immaterial," and cites a number of cases as supporting this view. We realize that this is merely an assumption for the sake of argument, but it would appear to be a needless one if the five parcels in question were in fact purchased with her separate funds.

Be that as it may, we will consider the entire problem in the light of the community property law of California, including the provision as to the presumption in favor of the wife's separate property under certain circumstances, so heavily relied upon by the appellant.

The appellee suggests that an amendment passed in 1927 (St. 1927, p. 826), dealing with personal property, can have no application to the facts in the case at bar, for the reason that all the property involved herein was acquired prior to 1924. This, however, is not entirely correct, since, as we have seen, parcel V was distributed to the appellant by deeds dated October 18, 1928, under an assignment of trust accepted by the bank on May 11, 1925. The point is not material, since, under our view of the facts, the presumption of the wife's separate property, both real and personal, even under the law as it now stands, has been rebutted by the evidence adduced in this case.

The pertinent sections of the Civil Code of California follow:

"§ 162. *Separate Property of the Wife.* All property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues, and profits thereof, is her separate property. The wife may, without the consent of her husband, convey her separate property."

"§ 163. *Separate Property of the Husband.* All property owned by the husband before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is his separate property."

"§ 164. *Property Acquired after Marriage.* All other property acquired after marriage by either husband or wife, or both, including real property situated in this state, and personal property wherever situated, heretofore or hereafter acquired while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this state is community property; but whenever any real or personal property, or any interest therein or encumbrance thereon, is acquired by a married woman by an instrument in writing the presumption is that the same is her separate property, and if acquired by such married woman and her husband, or by her and any other person, the presumption is that she takes the part acquired by her, as tenant in common, unless a different intention is expressed in the instrument; and the presumptions in this section mentioned are conclusive in favor of a purchaser, encumbrancer, pay-

or, or any other person dealing with such married woman, in good faith and for a valuable consideration. * * *"

Since the presumption of separate property is not being invoked here by "a purchaser, encumbrancer, payor, or any other person dealing with such married woman, in good faith and for a valuable consideration," the presumption relied upon by the appellant is, at best, disputable.

In Fanning v. Green, 156 Cal. 279, 282–284, 104 P. 308, 310, this entire question was discussed in an able opinion by Judge Angellotti. The court there said:

"It being admitted that the property was purchased with community funds, it was necessary, in order to make any portion of it her separate property, that it should have been given to her by her husband. Such a gift will be presumed under this statutory provision where a gift is essential to the theory that the property is the separate property of the wife. See Alferitz v. Arrivillaga, 143 Cal. 646, 77 P. 657.

"But the presumption so created is only a prima facie one, except in so far as purchasers and incumbrancers in good faith and for a valuable consideration are concerned. This is manifest from a reading of the statute. See, also, section 1961, Code Civ. Proc. Where the controversy is between the husband and the legal representative of the wife, the presumption 'may be controverted by other evidence, direct or indirect,' and it is only where it is not so controverted that the court or jury is bound to find according to the presumption. Section 1961, Code Civ. Proc. Whether or not it is so controverted is a question of fact for the trial court, and the conclusion of that tribunal is conclusive upon an appellate court unless it be manifestly without sufficient support in the evidence.

"It is clear that there can be no executed gift in the absence of any intention to give on the part of the donor. It is true that the facts and circumstances of a transaction may be such as to practically compel the conclusion that a gift was intended, and to render worthless any subsequent statement to the contrary on the part of the donor. But no such effect, we are satisfied, must necessarily be given to the mere fact that, in the case of the purchase of real property with community funds, the husband has directed that the deed shall run to the wife as grantee. There is nothing in the nature of such a fact that renders it consistent only with the theory of gift, and other facts and circumstances

may so tend to show another reason than the desire and intent to make a gift as to furnish ample warrant for a conclusion that no gift was intended, and therefore that there has been no 'executed gift.' * * * The well-settled rule is, as stated in Nilson v. Sarment, 153 Cal. 524, 530, 126 Am. St. Rep. 91, 96 P. 315, 317, 'where a husband purchases property with community funds, and directs the conveyance to be made to his wife, *with the intent to make it her separate property,* the deed will operate to vest the property in her as her separate estate.' The 'intent' to make it *hers,* her separate property, is a material factor in such a case, and while such intent may, and possibly must, be inferred where there is no other evidence than that showing the mere direction by the husband, it may also be shown not to have existed by any competent evidence.

"In the case at bar there is, in our opinion, other evidence that fairly and reasonably warrants an inference on the part of the trial court to the effect that no gift was intended. The indirect evidence by which the presumption of separate property may be controverted may consist in part of inferences (Code Civ. Proc. § 1957), deductions 'which the reason of the jury' (or trial judge) 'makes from the facts proved' (section 1958, Code Civ. Proc.)." (Italics are the court's.)

See, also, Stafford v. Martinoni et al., 192 Cal. 724, 738, 221 P. 919, and Estate of Jolly, 196 Cal. 547, 553, 238 P. 353.

And disputable presumptions "have been said to be the weakest and least satisfactory of evidence." Simonton et al. v. Los Angeles Trust & Savings Bank, etc., et al., 205 Cal. 252, 258, 270 P. 672, and Savings & Loan Society v. Burnett et al., 106 Cal. 514, 529, 530, 39 P. 922.

The master painstakingly traced the sources of the funds wherewith the various parcels were obtained, inquired into the intent of the parties, as disclosed by their words and actions, and, in general, examined minutely the circumstances surrounding each transaction. We are not disposed to disturb the master's findings, for we believe that there is substantial evidence to sustain them. The manner in which the bankrupt dealt with the property, as if it was indeed his own, the vagueness of appellant's testimony as to important details of transactions relating to her own alleged property, the belief of certain bank officers, based upon their dealings with the bankrupt, that he was actually "E. L. Neece," though the initials are

those of his wife—these and other details tend to sustain the view that no bona fide transfer of title to the appellant was really intended.

The master's findings must be approved, "even though," in the language of Remington, "the reviewing court might have reached a different conclusion had they tried the facts." Op. cit., at page 227.

Individually, each of these details might be insufficient to establish the bankrupt's intent to retain the real title to the property; but collectively they might well be persuasive on an examination of the record. And, as we have seen, that is the real test of whether or not the findings of the lower court and of the special master should be sustained.

The appellant contends that "the trustee in bankruptcy, in so far as he represents the rights of creditors herein, has not shown himself entitled to any relief whatsoever because it is not alleged or proved that any of the creditors having allowed claims were existing creditors at the time of the conveyances in question."

Section 70e (11 USCA § 110 (e) of the Bankruptcy Act provides: "The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided. ＊ ＊ ＊"

And, in the leading case of Stellwagen v. Clum, 245 U. S. 605, 614, 38 S. Ct. 215, 218, 62 L. Ed. 507, the Supreme Court has held: "Under this subdivision if a creditor could have avoided a transfer under a state law, a trustee may do the same."

In the case of Hibernia Savings & Loan Society v. J. V. DeRyana et al., 210 Cal. 532, 539, 292 P. 632, 635, the Supreme Court of California said: "The appellant makes the further and final contention that the evidence produced before the court was insufficient to overthrow the presumption created by section 164 of the Civil Code to the effect that the real estate here in question having been originally conveyed to Mrs. J. V. De Ryana was her separate property which she in turn had a right to transfer to her sister, Rachel Cafiero, *prior to the transaction by which her husband, J. V. DeRyana, became a debtor of the plaintiff and respondent herein*. The evidence before the trial court in the foregoing regard presents an interesting situation. It would be a waste of time, however, to review in detail this evidence, which in our opinion abundantly shows that throughout the entire period of his rather spectacular career he used the names of his wife and of her sister, Rachel Cafiero, who was at all times an inmate of his family, instead of his own name for the transaction of his business, and that these two women were in fact dummies who signed checks and other documents and took and transferred titles to real estate wholly according to his direction and without knowing aught about the details of his business, or about the particular transaction in which their names were used, but in which the real actor was himself. The transaction by which in the year 1922 he acquired the property involved in this action, taking the title thereto in the name of Rosalia [his wife] and about two years later causing it to be transferred to Rachel without any of the usual indicia of a change of ownership, the said property standing in the name of the latter at the time he perpetrated his fraud upon the plaintiff, securing thereby the sum of $7,000, a considerable part of which was immediately made use of to pay off an encumbrance upon said property representing a portion of its original purchase price, fully illustrates the real situation as to the status and ownership of the property in question. We think the evidence of these transactions was such as to overcome the presumption and fully justify the finding of the trial court to the effect that J. V. DeRyana was at all times the real owner of the property in question and that said property having been duly attached should be subjected to the satisfaction of the plaintiff's claim." (Italics our own.)

In her reply brief or "written argument," however, the appellant seeks to distinguish the DeRyana Case from the case at bar, apparently on the ground that here "there is no finding that fraud existed, nor is there a whisper in the evidence that the bankrupt conducted his business in his wife's name, or that he held out the property in question to third parties as being his own."

While it may be conceded, indeed, that the facts of the two cases are not perfectly parallel, there is, in our opinion, sufficient similarity between them to render the DeRyana decision persuasive to us here. There is evidence tending to prove that the bankrupt assumed his wife's name in his transactions with at least one bank, and caused himself to be regarded as being in fact "E. L. Neece." This testimony as to the manner in which bank officials were deceived, together with the various indications, relied upon by the master, that the bankrupt did not intend that his wife should take title to the land deeded to her as grantee, sustains the view that the bankrupt intended that the parcels

in question should in fact be community property.

We have already adverted to the master's report on the question of fraud. The fact that the record shows evidences of fraudulent dealings on the bankrupt's part serves to bring the present controversy within the doctrine of the DeRyana Case.

The evidence as to the bankrupt's assumption of his wife's name, referred to above, consists of Exhibit 11 and the testimony of two officers of the Wilmington Branch of the Bank of Italy. Exhibit 11 is a "Signature card given to the Commercial National Bank of Commerce [sic], Wilmington Branch, dated 4–21 '25, showing signature of 'E. L. Neece' and 'Louise P. Neece,' in the opening of an account in said Bank, under name of 'E. L. Neece and Louise P. Neece.' "

With reference to the bankrupt's manner of dealing with the bank, Kenneth A. Nairn testified as follows: "I was formerly manager of the branch of that bank [Bank of Italy] at Wilmington, California. I commenced my duties as manager at Wilmington about March 1, 1926, and left there about March 1, 1928. I know E. L. Neece. He is in the court room here; the gentleman at the rear (witness refers to George W. Neece). That is the party I know as E. L. Neece. He did business at our bank while I was there."

Again, we have the testimony of F. M. McBurney, with specific reference to Exhibit 11: "I am Manager of the Wilmington Branch, Bank of Italy. I have been manager of that branch since February 15th, 1928. During that time I had occasion to visit with Mr. Neece, the gentleman sitting here. I knew him under the name of 'E. L. Neece.' I did not know him as 'George W. Neece,' or G. W. Neece. He always signed his name at that bank as 'E. L. Neece.' The card you show me is the signature card on the account bearing the designation 'E. L. Neece and Louise P. Neece' at our bank. * * * The account was opened April 21, 1925, and closed May 25, 1928. From the time I have been at the bank and, as far as the records disclose, before I went there, the gentleman I designated here as E. L. Neece did business at the bank as E. L. Neece. The 'Commercial National Bank of Los Angeles' appears on this signature card, then the 'Bank of America' and then the 'Bank of Italy,' which is the present bank."

The testimony of these two reputable witnesses bears the earmarks of truth, and we believe it. We further believe that this testimony tended to support the special master's belief that "it is quite apparent that about this time the bankrupt believed that the disaster, which he had been anticipating and foreseeing for years, due undoubtedly to the precarious nature of the real estate business and the possible liability attending upon so many real estate trades, was then upon him, and that funds in the name of George W. Neece would be subject to the demands of his creditors." We can readily understand how such testimony would sharpen the scrutiny to which the chancellor and his special master would subject the transactions of such a bankrupt.

■ We have noted the appellant's argument that the fact that joint income tax returns of George W. Neece and E. Louise Neece were filed for several years between 1922 and 1927 is "entirely consistent with the theory that the income therein referred to is treated as the separate property of George W. Neece and E. Louise Neece, and that it was inconsistent with the theory that said income is community property." If the special master was mistaken in his ruling admitting this evidence and in his interpretation, referring to the 1922 return, that "it is a community property return and could not be made in this form if the property of the individuals were separate property," such errors were not prejudicial, since there is other evidence to sustain his holding that the five parcels in question were in fact community property. Furthermore, during most of the years in question, the law as to community property with its relation to income tax returns was unsettled, and it would have been easy for a layman to have filed a joint return without thereby necessarily holding out the property as being either separate or community estate.

■ There are a number of other subsidiary and ancillary matters in this case which it is not necessary for us to determine, since the foregoing observations dispose of the controversy. For example, we are not considering any of the testimony given by the bankrupt when called by the appellee for cross-examination under the state statute (Code Civ. Proc. Cal. § 2055), since the lower court held that "the special master's ruling in allowing an examination of the husband was erroneous in two respects." No cross-appeal has been taken in this case, and the court's ruling must stand. Even if these minor questions were resolved, on the law,

in favor of the appellant, the result on the facts would not be affected.

We believe that there was evidence sufficient to sustain the findings of the special master and of the District Court.

Accordingly, the decree is affirmed.