86 Cal.App.2d 456 (1948)
Estate of HAROLD W. SMITH, Deceased. RACHEL ELIZABETH SMITH, Appellant,
v.
THE SAN FRANCISCO BANK (a Corporation) et al., Defendants; MARION SMITH PASSARELLA, Respondent.
Civ. No. 13459. 
California Court of Appeals. First Dist., Div. One. 
June 30, 1948.
 Samuel D. Hamburg for Appellant.
 Robert E. Hatch for Respondent.
 PETERS, P. J.
 Harold W. Smith died testate in California on October 7, 1944. By his will, executed in North Carolina in July of 1941 while he was a resident of that state, he devised his entire estate, appraised at a little over $17,000, to his then newly-acquired wife whom he had married in June, 1941, in North Carolina. The couple came to California in November, 1941. The will of decedent was admitted to probate, and, upon the hearing of the petition for final distribution, it developed that Marion Smith Passarella, the respondent, claimed an interest in the estate as a pretermitted heir, claiming to be the adopted daughter of the deceased. She *459 therefore claimed a one-half interest in that portion of decedent's estate that was his separate property. After a hearing, the probate court decreed that respondent was a legally adopted and pretermitted daughter of deceased, that the entire estate was the separate property of decedent, and that appellant and respondent should share equally therein. The wife appeals from the decree of final distribution, challenging both the determination that respondent was legally adopted, and the finding that the entire estate was the separate property of the deceased. [1] In addition, appellant contends that, if it be assumed that respondent was legally adopted, nevertheless she may not take as a pretermitted heir under section 90 of the Probate Code because, so it is asserted, the will shows, on its face, that the testator intended to exclude respondent from his will. This contention is based upon the fact that the will left all of decedent's property to appellant and specifically left to her the proceeds of all insurance policies, and provided that this property was to be "the sole and absolute property" of appellant. It is too clear to require extended discussion that such provisions leaving all the property to the widow, or disposing of the entire estate, do not express an intent to exclude a child. To exclude a child the words of the will must show that the testator had the child in mind, but, nevertheless, excluded such child. (See many cases collected 26 Cal.Jur. 238, p. 925.) There is no such language in the present will.
 This case was argued together with Estate of Morgan, 1 Civ. 13686, and Estate of Martin, 1 Civ. 13687, post, p. 474 [195 P.2d 839], inasmuch as all three cases involve common questions relating to the validity of adoption decrees and the right collaterally to attack such decrees. The appellants in the Estate of Morgan, subsequent to the oral argument, requested that their appeal be dismissed, and it has been so ordered.
 In the instant case, the factual background of the adoption issue is not in dispute. Respondent is the child of Edith and George Norton. She was born in 1913. Shortly after her birth George Norton abandoned his wife and child. In 1920, in Buffalo, New York, Edith Norton secured a final decree of divorce from George Norton. In 1923, Edith married decedent, Harold W. Smith, and lived with him until her death. In August, 1923, the decedent adopted or attempted to adopt the respondent in New York. It is the validity of that adoption decree that presents one of the main questions on this appeal. A complete photostatic copy of the adoption proceeding *460 was introduced into evidence. The petition for adoption was prepared, sworn to and filed in Erie County, New York, on August 27, 1923. It alleged that the petitioner, Harold W. Smith, had married the mother of the child, the child then being 10 years of age, and desired to adopt the child; that the father of the child, George Norton, in September, 1913, had "abandoned his said wife and child"; that since that date the father had contributed nothing to the child's support, and had never returned to or communicated with his wife or child; that "George E. Norton abandoned said Marion Crocker Norton in September, 1913, and has abandoned her ever since said date." Attached to this petition was a verified statement of the mother of the child sworn to and filed on August 27, 1923, reciting that she had read the verified petition of her then husband; that the "statements concerning the abandonment of said Marion Crocker Norton are true to the knowledge of deponent"; that deponent has no knowledge or information as to the present whereabouts of the father of the child, and has had no such information since May of 1920. The mother also filed a consent to the adoption, also dated August 27, 1923. The order of adoption was dated, signed by the judge and filed on August 27, 1923. It recites the facts concerning the filing of the petition, the agreement to adopt, and the consent to the adoption by the mother, and then the order states: "... and it appearing that George E. Norton, the father of said Marion Crocker Norton, abandoned said Marion Crocker Norton in September, 1913, and has never communicated with her or contributed to her support in any manner since said date." The order of adoption is then made.
 It will be noted that there is nothing in the record of the adoption proceeding to indicate that any type of notice, actual or constructive, was given to the father of the child of the pendency of that proceeding. Indeed, the recitals in the various documents referred to above, and the fact that the petition for, and the order of, adoption bear the same date, indicates that no notice of the adoption proceeding was ever given the natural father of the child. The recitals in the adoption proceeding, however, do not indicate affirmatively or negatively whether there had been a prior adjudication of abandonment and whether, if there had been, the father had notice thereof.
 Appellant urges that since the natural parent had no notice of the adoption proceeding, the order of adoption was void for lack of jurisdiction in the Erie County, New York, court, *461 and for that reason it is contended that respondent never became the legally adopted child of decedent and cannot take any portion of his estate as a pretermitted heir. In this connection the appellant relies upon the Estate of Hampton, 55 Cal.App.2d 543 [131 P.2d 565], and urges that the holding of that case conclusively establishes that the adoption decree in the instant case is completely void.
 For the purposes of clarity, the exact relationships of the litigants in the instant case should be again set forth. The adopted child is the respondent. She does not challenge the adoption decree, but, in fact, is relying upon it to establish her relationship to the deceased, her adopted father. No party to the adoption proceeding is challenging the adoption order. No relative of the adopted child is attacking the decree. The mother of the child consented to the adoption, and is now dead. Harold W. Smith, who adopted the child, is now deceased, and at no time since the order was made 25 years ago has he challenged or questioned the decree. The real father of the child is not a party to this proceeding and has, so far as the record shows, at no time ever challenged or questioned the decree. The appellant is a subsequent wife of Harold W. Smith. She was not a party to the adoption proceeding, and has no legal relationship with respondent. She claims through the adopting parent. It is she who seeks to attack collaterally the adoption decree.
 The facts of the Hampton case were these: Hazel Higgins Sliff was the illegitimate daughter of Katherine Higgins Hampton. Katherine died testate and failed to mention her daughter Hazel in her will. Hazel opposed the probate of the will on the ground that she was a pretermitted heir. The proponents of the will contended that Hazel had no legal right to inherit from her real mother for the reason that in 1901, in Kansas, Jesse and Mary Ann Parker had adopted Hazel. The proponents, in support of this contention, offered into evidence the records of the Kansas abandonment and adoption proceedings. The trial judge ruled that these records were inadmissible for the reason that they showed that the real mother of Hazel, Katherine Hampton, had no notice of either proceeding, and that, according to the trial judge, rendered the Kansas adoption order a nullity as to Hazel. This determination was approved by the District Court of Appeal. A petition for hearing in the Supreme Court was denied, three justices voting for a hearing. *462
 The theory of the District Court of Appeal as disclosed in the opinion was this: The Kansas statutes provided that the required consent to an adoption could be had in either of two ways. First, there was the normal method of the parents of the child appearing before the court and giving their consent. In addition, the statutes provided for a court hearing at which the child could be judicially determined to have been abandoned by its parents, in which event the court was empowered to turn the child over to a designated institution. After compliance was had with this procedure the statutes authorized the governing official of the institution to give his consent to the adoption, thus disposing with parental consent. Insofar as the abandonment proceeding is concerned, the pertinent Kansas statute required that the parents be notified, if their whereabouts were known, not less than three days before the hearing, otherwise notification to the person having actual custody of the child was all that was required. No statutory provision for any other type of notice to the parents was provided.
 In the Hampton case, Hazel was born illegitimately to Katherine Higgins in 1897 in Kansas. When the child was 6 weeks old Katherine placed the child in Kansas in the home of Jesse and Mary Parker, both now deceased. Katherine visited the Parkers two or three times during 1898 and 1899, and in 1900 wrote them that she was intending to come to California. Thereafter, the Parkers heard nothing further from her. The proceeding to have Hazel declared a neglected and abandoned child was started in 1901. She was found to be an abandoned child and turned over, by court order, to the institution designated in the statute. The president of that institution then signed the consent to the adoption of Hazel by the Parkers.
 The record shows that the abandonment proceeding was preceded by an order to show cause issued by the Kansas court and directed to the Parkers and to the mother of the child. The sheriff returned the order to show cause, showing service on the Parkers on October 9, 1901, but endorsed on it the statement that: "I could not find the within named Kitty Higgins in my County." The order determining that Hazel had been abandoned was signed October 14, 1901. It finds that "proper notices have been served, and that the proceedings are regular," but also specifically recites that "notice was issued to the mother of said child Kitty Higgins, and said notice was returned by the sheriff of Sedgwick *463 Co., Kansas, with the report that said sheriff was unable to find said Kitty Higgins within the county." (55 Cal.App.2d at pp. 549-550.) The child was declared to be a neglected child and turned over to an institution. The next day, the president filed his consent to the adoption of Hazel by the Parkers, they filed their agreement to adopt, and the adoption decree was signed.
 The District Court of Appeal held that Hazel, the adopted child, could attack these proceedings on the ground that they were void, under the due process clause, because of lack of proper notice to her mother of either the abandonment or adoption proceedings. This conclusion was reached even though the Kansas statutes did not require such notice, it being held that the due process clause of the federal Constitution required such notice. In reaching this conclusion the court first made this observation (55 Cal.App.2d at p. 552): "... a judgment of a sister state is binding upon the courts of this state, if valid, by virtue of the full faith and credit clause of the United States Constitution (art. IV), but the jurisdiction of the court of a sister state in which a judgment is rendered, may be questioned collaterally in another state notwithstanding the full faith and credit clause ... and the judgment may be ignored if want of jurisdiction appears on the face of the record. ..."
 The court further said (55 Cal.App.2d at p. 553): "We must therefore determine whether, from the proffered record before us, under the law and under the due process provision of our Constitution ..., sufficient notice was given whereby that court acquired jurisdiction of the cause and parties."
 At page 557 the court says: "Without attempting to adopt Hazel Sliff ... by giving the notice ... required, petitioners attempted to avoid that requirement, in reference to notice, by seeking the aid of the abandonment proceeding which, as appellants contend, does not require notice of the examination or proceedings to be given to the parent if it is shown that the only parent authorized to give consent has neglected and abandoned the child, unless her whereabouts is known."
 At the pages hereinafter designated the court stated the following:
 (P. 557): "A proceeding by which the parent, entitled to the custody of his or her minor child, is deprived of such custody is a proceeding adverse to him or her. (Guardianship of Van Loan, 142 Cal. 423 [76 P. 37] ...)." *464
 (P. 558): "... in this proceeding, did the court acquire jurisdiction of the parties? If not, the judgment awarding the custody of the minor child to the Wichita Children's Home for the ultimate purpose of allowing it to consent to the adoption of the child, rather than the parent, was void, and the adoption proceeding based on such a void judgment is likewise void."
 (P. 559): "Our attention has been called to many cases which hold that after service of notice (either personal or substituted) of such abandonment proceedings on the parent or parents, no written consent of such parent or parents is necessary if the trial court determines, on the hearing, upon proper and sufficient evidence, that the minor child has been abandoned by them. [Citing cases.] This is, however, not determinative of the issue here presented. The mere fact, if alleged in the petition and found by the court, that the parent neglected or abandoned the minor child, will not and does not dispense with the right of such parent to notice, either actual or constructive, of such proceeding, in order that he of she may appear and contest the question to be there determined, i.e., whether or not, in fact, he or she has actually neglected or intentionally abandoned the child so that the court may then be authorized to so declare it abandoned for the purpose of allowing the children's home to give consent to a subsequent adoption of the child in the place and stead of its natural parent by reason of her or his claimed misconduct."
 The court quoted the following language from Guardianship of Michels, 170 Cal. 339 [149 P. 587] (p. 560): " '... it is within the power of the state to declare what sins and acts of omission or commission shall constitute abandonment by the parent or parents. Unquestionably due process of law demands some sufficient notice to the parents of the proceedings about to be taken, with an opportunity to the parents to be heard upon the issue.' "
 After noting an excerpt from 1 California Jurisprudence, page 429, in which is stated the rule that notice of the abandonment proceedings would have to be given the parents in order to comply with due process requirements, the court says (p. 561):
 "Our attention has not been directed to any case in Kansas construing their statute in this respect. However, this question is discussed and many cases are cited in 1 American *465 Jurisprudence, page 642, section 40, and page 644, section 44. ... It is there said:"
 " 'The existence of the facts rendering consent unnecessary, though alleged in the petition, must be judicially determined, and notice is therefore an essential prerequisite to a valid decree and a cutting off of the parent's rights, for even where the parents, by their wrongful neglect or criminal conduct, have forfeited their right to give or withhold consent, it does not necessarily follow that they are not entitled to notice ... although no notice may be specified by statute in cases where the rights of the parent have been forfeited by abandonment or other misconduct, notice will ordinarily be required in order to bind the parent on the question of such abandonment or misconduct. ... Although notice is not always specifically required, the judicial proceedings by which adoption is effected are prescribed as a duty of courts of record, wherefore it is presumed that the legislature intended that such proceedings should be in accordance with the usual practice of such courts, requiring notice as an element of due process. ... Non-residence of the parent does not excuse failure to give notice to him, although constructive notice may be given where the residence of the parent is unknown. ... Where the custody of a child has been taken from the parents for delinquency, by adversary proceedings (upon due notice), notice of adoption proceedings is unnecessary, since the parents have already been divested of the custody and control of the child.' "
 The court concluded (p. 562): "It therefore must follow that since it is an elemental and fundamental principle of law that notice to a party whose rights are to be affected by a judicial proceeding is an essential element of due process, the failure to give adequate notice to the mother of Hazel L. Sliff of the abandonment proceeding as an enabling step to secure the adoption of her child without her consent, was void as being in violation of the due process clause of our Constitution. The order of the trial court refusing the introduction of such record into evidence must be sustained."
 The appellate court then went on to state (p. 563) that the adopted child "who was the central figure therein and the person whose interests were mainly affected thereby, has the right to attack the decree entered which purports to thus interfere with her right of inheriting from her natural mother." *466
 The facts of Estate of Hampton, supra, are very similar to those of the instant case, with two vital exceptions: First, in the Hampton case the adopted child was seeking to inherit from her real mother, and it was the adopted child, not a stranger, that sought to attack the adoption order. In the instant case, the adopted child is relying upon, and seeks to uphold, the adoption order, while one claiming through the adopting parent seeks to attack it collaterally. In the second place, in the Hampton case the defect of lack of service appeared on the face of the record. In the instant case, it does not appear from the face of the record, or by evidence, that there might not have been a prior abandonment proceeding of which the father had actual notice.
 In 1923, when the adoption order was made in the instant case, the New York domestic relations law contained provisions substantially similar to those of Kansas, except that the statute expressly dispensed with notice of adoption proceedings when the parent had abandoned the child. (Consolidated Laws of New York (2d ed.), ch. 14, 110-118.)
 In the case of In re Johnston, 76 Misc. 374 [137 N.Y.S. 92], the real father of the adopted child was attacking the adoption decree because of lack of service upon him. There, as in the Hampton case, an abandonment proceeding was instituted and the fact of abandonment proved and found, but the father was not served. It was held that without service on the father the subsequent adoption order was void as to him.
 The same conclusion was reached in Matter of Livingston, 151 App.Div. 1 [135 N.Y.S. 328], where a real mother was attempting to secure her child from the adopting parents. The court discusses the constitutional issue at some length and holds that, if the mother had no notice of the abandonment or adoption proceedings, the order of adoption was void as to her.
 In the case of Matter of Dein, 135 Misc. 244 [237 N.Y.S. 658], the court stated (p. 245): "It appears that the statute authorizes an adoption without the consent of the surviving parent, if such surviving parent has abandoned the minor child. This statute contains no express provision requiring notice to the parent in order that he or she may be heard on the question of whether or not he or she has abandoned the child. Without such notice, either actual or constructive, an adjudication cannot be made that will be binding on the parent on that issue. (People ex rel. Lentino v. Feser, 195 *467 App.Div. 90, 96 [186 N.Y.S. 443].) The order of adoption, however, is not void or voidable because of her right to attack it. (People ex rel. Pickle v. Pickle, 215 App. Div. 38, 44 [213 N.Y.S. 70].)"
 Thus it will be noted that, under the New York statutes, notice to the real parent or parents as a condition precedent to a valid adjudication of abandonment was not expressly required. Such notice, however, is required under the due process clause. But, in the instant case, this lack of notice does not affirmatively appear on the face of the record. There is no affirmative showing that the real father of the child was not given notice of a possible prior abandonment proceeding. There is only a failure to recite that such a hearing, based upon proper notice, had been had. [2] The general rule, at least as to domestic judgments, seems to be that before a judgment may be attacked collaterally the defect must affirmatively appear on the face of the record. (Wells Fargo & Co. v. City etc. of San Francisco, 25 Cal.2d 37 [152 P.2d 625].) [3] However, there is authority that a foreign judgment may be attacked collaterally by evidence showing lack of jurisdiction even though the defect does not appear on the face of the record. (Estate of Pusey, 180 Cal. 368 [181 P. 648]; Hammell v. Britton, 19 Cal.2d 72 [119 P.2d 333]; duQuesnay v. Henderson, 24 Cal.App.2d 11 [74 P.2d 294]; Ryder v. Ryder, 2 Cal.App.2d 426 [37 P.2d 1069].) If it be assumed that this last-mentioned rule is applicable to the instant case, it should be noted that appellant introduced no evidence, other than the record of the adoption decree, from which we can ascertain whether there had been a prior duly-noticed abandonment proceeding. This point may be conclusive against appellant. [4] The New York adoption order established a prima facie case for respondent. That order, under any theory, is entitled to full faith and credit until it is established that it is void. The burden is upon the person attacking the decree to establish its invalidity. While the adoption decree does not affirmatively recite that there was a prior duly- noticed abandonment proceeding, it does not recite that there was no such proceeding. The burden was on appellant to prove that the foreign decree was void. This she did not do.
 [5] Another, and more fundamental reason exists why appellant, a stranger to the adoption proceeding, is in no legal position to attack collaterally the New York adoption *468 decree, even if the defect of lack of notice to one of the real parents appeared on the face of the record. Such defect, at most, constituted lack of due process to the parent not served, which point may be raised only by the person affected by such procedural lack of due process, and may not be raised by persons over whom the court had jurisdiction. [6] Fundamentally, an adoption creates a status, and is a proceeding at least quasi in rem. Either the state of domicile of the child or the state of domicile of the adopting parents has jurisdiction over the adoption proceedings. (Restatement of Conflict of Laws, 142, 143; see, also, 54; see, also, Restatement of Judgements, 33.) That means such state has jurisdiction over the subject matter. But there are also personal rights involved. In order to terminate these rights it is necessary, in addition to securing jurisdiction over the subject matter, also to secure jurisdiction over the real parents, the child and the adopting parents. [7] As to any person not served, actually or constructively, the proceeding is subject to attack collaterally. But persons participating in the proceeding have no legal right to object that some other person was deprived of his constitutional rights. The only persons who may object are those not served, or, under the rule of the Hampton case, the child. There is no sound legal reason why persons who participated in the proceeding, those claiming through them, or strangers to the proceeding, should be permitted to attack an adoption decree collaterally when the court rendering it had jurisdiction of the subject matter. [8] While it is true that a judgment that is absolutely void may be attacked collaterally or directly by parties or strangers (Andrews v. Superior Court, 29 Cal.2d 208 [174 P.2d 313]; Estate of Pusey, 180 Cal. 368 [181 P. 648]), that rule usually applies where the court had no jurisdiction over the subject matter as well as no jurisdiction over the parties. It has no application to cases where the court has jurisdiction over the subject matter and over some of the parties. In the instant case, the New York court had jurisdiction over the subject matter, over the consenting parent and over the adopting parent. The only assumed defect was failure to give one of the parents notice of the proceeding. That party, and, under the rule of the Hampton case, the child, may collaterally attack the decree. But those participating in the proceeding, and those claiming through them, should not be permitted so to attack the decree. *469
 There seems to be remarkably few authorities on this issue directly in point. In Appeal of Woodward, 81 Conn. 152 [70 A. 453], the court held that those claiming through the adopting parent were in no legal position to attack an adoption proceeding where no notice was served on the parents. (See, also, Goodrich on Conflict of Laws (2d ed.), p. 384.) There is a note on the Hampton case in 31 California Law Review, page 325, which generally approves the rule of that case, but in footnote 16 appearing on page 328, appears the following comment: "The court in the instant [Hampton] case held the adoption proceedings void. This is proper, but the proceedings should not be subject to collateral attack by the heirs of the adopting parents. (See dictum in Estate of Camp [131 Cal. 469 (63 P. 736, 82 Am.St.Rep. 371)].) ... The adopting parents and their heirs should be estopped from attacking the validity of the decree just as the party obtaining a divorce decree is estopped from denying its validity for lack of jurisdiction of the court awarding the decree."
 In the Estate of Camp, referred to in the above quotation, a brother of decedent, after the record of an adoption by the decedent of two children had been read into the record, offered to prove that the adoption was defective because the children had not, in fact, been abandoned by their parents. The court treated the fact of abandonment as being jurisdictional to the right of the court to make the adoption order, but then held that the recital in the order that the fact of abandonment appeared to the satisfaction of the trial court could not be collaterally impeached by the brother of the adopting parent. The court then, either as an alternative ground of its opinion or by way of dicta, stated (p. 471): "Whether the parents of the child in a direct proceeding against the adopting person for the recovery of the persons of the children would be bound by this determination of the judge, is not involved herein. It is very clear that, if an action had been brought against the decedent in his lifetime for necessaries supplied for the support of the children, he would not have been permitted to show in his defense that at the time of the proceedings for their adoption the parents had not in fact abandoned them. He would have been estopped by his recital of their abandonment in his petition. Inasmuch as the rights of the appellant herein are derived solely through and under the decedent, he can have no greater *470 right to question the validity of the order than would the decedent."
 Whether this holding was an alternative ground of the opinion, and therefore a precedent that those claiming through an adopting parent may not attack collaterally the adoption order (Bank of Italy etc. Assn. v. Bentley, 217 Cal. 644 [20 P.2d 940]), or was mere dicta, need not be now decided. Whatever the nature of the ruling may have been it is sound law and should be followed. [9] The adopting parent sets in motion the adoption machinery. He drafts the documents. He determines which of several procedures to follow. He should be held to be estopped from attacking the decree secured by himself. Such estoppel should also apply against those claiming through the adopting parent.
 For either or both of the reasons given above it must be held that the trial court correctly held that the adoption decree here involved established, as against appellant, the validity of the adoption. The trial court, therefore, correctly determined that respondent was a pretermitted heir.
 [10] The other basic contention of the appellant is that the finding of the trial court that all of the property in the estate was the separate property of decedent, is unsupported by the evidence. This problem of tracing the nature of the property is primarily a factual one, and normally is a question for the trial court. There are certain presumptions as to the community nature of property acquired after marriage (Civ. Code, 164), but whether such presumptions have been rebutted is primarily a question of fact. A finding that property is separate property of a deceased will not be disturbed if there is substantial evidence or reasonable inferences from the evidence to support it. (Estate of Trelut, 26 Cal.App.2d 717 [80 P.2d 147]; Estate of Ades, 81 Cal.App.2d 334 [184 P.2d 1].) In many cases, as in the instant one, the problem involves the intent of the decedent, who, of course, is not present to state his intent.
 Not involved in the present controversy is certain property received by the appellant which was not part of the estate of her deceased husband. Upon the death of the decedent there was a joint tenancy bank account in a San Francisco bank in which there was a balance of about $800. In addition, appellant received $3,000 in cash from her husband's mutual aid benefits, he having been a retired Army officer, and also received a life annuity of $63 per month. These items were not part of decedent's estate and are not here involved. *471
 As to the property within the estate, the following are the facts: The inventory shows that there was $1,100 in cash in decedent's safe deposit box, $1,300 in a commercial account under his sole name in a Fresno bank, and two life policies totaling $13,000 payable to the estate. In addition, there was a Ford automobile and a trailer, both registered in decedent's name. There was also some realty in Mariposa County which stood in his name, and certain furnishings located there or in storage in San Francisco. Appellant contends that all of these properties were acquired after marriage, and, therefore, under the presumptions contained in section 164 of the Civil Code, must be presumed to be community property.
 Appellant married the decedent in June, 1941, in North Carolina, where decedent was then stationed on Army duty. They came to California in November, 1941. The husband died in October, 1944. Thus the parties lived together about 40 months. On December 9, 1941, a joint commercial account in the name of husband and wife was opened in a San Francisco bank. Admittedly, at the time of marriage the husband owned a piece of San Francisco property which he sold, early in 1942, for a substantial sum of money which was deposited in the joint account. In December, 1941, the parties bought a home in San Francisco for $6,250, and the title thereto was taken in joint tenancy. A cash payment of $750 was made on this house, and payments thereafter made, first, of $42.50 per month, and later $38 per month. They later sold this home for $8,800 and paid off the mortgage of $5,500. The net of $1,500 was used, in part, by decedent, to pay off on a loan he had made on his life insurance policies, and the balance was deposited in the joint account. In 1943 the Mariposa County property was purchased with a $1,500 check drawn on the joint account. The automobile and trailer were purchased about May, 1944, with checks drawn on the joint account. The $10,000 life insurance policy was fully paid up before the marriage, but decedent made several loans on the policy before marriage, and these loans, totaling $3,506, were paid off after marriage. The $3,000 policy was a 10-payment life policy on which $1,269 was paid to the company after marriage. The decedent retired from the Army at the time of his marriage, and thereafter received net from the government $248 per month, he having authorized the government to deduct from his retirement pay a payment of $24 per month plus for the insurance premiums. *472
 The joint account was originally opened in an amount of about $300, which came from decedent's salary. The retirement benefits checks from the government were mailed directly to the bank and deposited in the joint account. The appellant testified that the decedent received from the government during their married life the sum of $10,618, and that for a short period he worked as a defense worker and earned net the sum of $814.93, making net earnings of $11,432.93. When asked about their living expenses appellant testified "I guess around $200 a month." If this figure be accepted, it would mean that in the 40 months of their marriage about $8,000 was expended on living expenses.
 Appellant, while admitting that the money received from the sale of the San Francisco property owned before marriage was her husband's separate property, contends that when such funds were deposited in the joint account, a gift of such funds to her was consummated, citing such cases as Wheeland v. Rodgers, 20 Cal.2d 218 [124 P.2d 816]; Monnette v. Title Ins. etc. Co., 107 Cal.App. 313 [290 P. 668]. She then contends that when the other properties were purchased with funds from that account they likewise became joint tenancy property, even though taken in the name of the husband alone. (See Wallace v. Riley, 23 Cal.App.2d 654 [74 P.2d 800]; Estate of Harris, 9 Cal.2d 649 [72 P.2d 873].) She applies the same argument to the Fresno bank account which, although in the name of decedent alone, was opened with a check on the joint account. She also contends that the $1,100 in the safe deposit box must be presumed to be community property, because, although its source was not traced, it was discovered after marriage. (Estate of Jolly, 196 Cal. 547 [238 P. 353].) She also urges that she has a community interest in the two life policies because $1,269 of premiums on one policy, and a loan of $3,506 was paid off on the other, after marriage. The automobile, trailer, and Mariposa property, according to her contention, must be presumed to be community property because "acquired" after marriage. (Falk v. Falk, 48 Cal.App.2d 762 [120 P.2d 714]; Veterans' Welfare Bd. v. Liebhart, 50 Cal.App.2d 179 [122 P.2d 693].)
 [11] There can be no doubt that most of the property here involved, at the start of the trial, was presumptively community property, for the reasons set forth by appellant. But the trial court has found that, in fact, it was separate property. The real question is whether there is "satisfactory" *473 evidence to support that finding, and that means not only direct evidence, but reasonable inferences from that evidence. It is obvious that this man died possessed of property valued far in excess of the money he earned during marriage. While most of the property was purchased with money from the joint account, the real question is the intent with which money from that account was later used to buy property taken in his name alone. The fact that most of the subsequently purchased property--the automobile and trailer and the Mariposa property, as well as the money in the safe deposit box and the money in the Fresno account--were placed in the separate name of decedent although paid for, in the main, with money from the joint account, is some evidence that the decedent intended it to be his separate property. While it is true that when the only evidence is that separate and community property are commingled, the entire fund must be treated as community if the separate funds have not been identified (Fountain v. Maxim, 210 Cal. 48 [290 P. 576]; Falk v. Falk, 48 Cal.App.2d 762 [120 P.2d 714]), that rule has no application where there is other evidence. [12] In the instant case we know that the total value of deceased's estate far exceeds his community earnings. We have the evidence of the change of title of much of the property from separate to joint, and back to separate. In addition, accepting the testimony of appellant as to her "guess" as to the family expenses of $200 per month, in their 40 months of marriage the family expenses totaled $8,000. During this same period the total community income was $11,432.93, which leaves a net of community savings of $3,432.93. It is a well-settled presumption in such cases that the expenses of the family are paid from community earnings, and that the excess over community earnings less community expenses is separate property. (Huber v. Huber, 27 Cal.2d 784 [167 P.2d 708]; Van Camp v. Van Camp, 53 Cal.App. 17 [199 P. 885]; Estate of Tompkins, 123 Cal.App. 670 [11 P.2d 886]; Estate of Ades, 81 Cal.App.2d 334 [184 P.2d 1].)
 Under these circumstances we think that except as to the sum of $3,432.93--the excess of community earnings over community expenses--there was "satisfactory" evidence that the balance of the property was the separate property of the deceased. As to this excess, although the evidence of family expenses was most incomplete, out of an abundance of caution we will accept appellant's "guess" of $200 per month. *474 This will require a partial reversal and a partial affirmance.
 The decree settling, allowing and approving the first and final account and the supplemental accounts, and of final distribution is hereby modified to provide that of the cash on hand $3,432.93 was the community property of deceased and appellant, and that appellant is entitled to the whole thereof; but in all other respects the decree is affirmed. Both sides to bear their own costs on this appeal.
 Ward, J., and Bray, J., concurred.