[Civ. No. 16156. First Dist., Div. One. Apr. 11, 1955.]

Estate of GEORGE CHARLES ADAMS, Deceased. ARTHUR C. ADAMS, as Administrator, etc., Appellant, v. CAROLINE SCHMITT AYERS et al., Respondents.

Norman A. Eisner and Haskell Titchell for Appellant.

Robert E. Hatch for Respondents.

PETERS, P. J.—The four surviving brothers and a sister of George Charles Adams (hereafter called the Adams claimants), through one of them who was appointed administrator of the estate, appeal from a decree determining that certain relatives of the intestate's predeceased spouse (hereafter referred to as the Schmitt claimants), are entitled to inherit as statutory heirs of George Adams, under section 228 of the Probate Code, their share of that portion of the estate found to have been the community property of George Adams and his predeceased wife, Isabella.

The basic question presented revolves around the sufficiency of the evidence to sustain the findings that in 1941, when Mrs. Adams died, certain described property was the Adams' community property, and that the Schmitt claimants successfully traced that property into a portion of the estate of George Adams, who died in 1951.

The basic facts and findings are as follows: George Adams died July 22, 1951, leaving a will in which his wife Isabella was named as sole beneficiary. George had married Isabella Schmitt on December 5, 1908, and lived with her in California until her death on June 2, 1941. Inasmuch as Isabella predeceased George, his will was ineffective, and the property in his estate must be divided as if he died intestate. George did not remarry, and neither he nor his predeceased wife are survived by issue.

As already stated, George was survived by four brothers and a sister, all of whom are now alive. They constitute the Adams claimants.

In 1941, Isabella was survived by her husband, three sisters, and by a nephew, the sole child of a predeceased sister. One of the three surviving sisters died in 1947, and was survived by eight children. Another sister has assigned her interest in the Adams estate to Eleanor Willis. This assignee and the above enumerated surviving relatives of Isabella constitute the Schimtt claimants. They came into the probate of the Adams estate by means of a petition to determine heirship filed by one of them.

The trial court made detailed findings, in which generally speaking, it grouped the assets of the estate of George into three main classes:

(1) Those assets that were clearly George's separate property, having been derived from a separate property source,

(2) Those assets that were community property at the death of Isabella, having been acquired during marriage or having become such by indiscriminate commingling during marriage, and which were still traceable into the estate of George, and

(3) Those assets, called residuary assets, consisting of property on hand at the death of George, both separate and community, that George had commingled into new and more valuable assets after Isabella's death.

The court found that during the 32 plus years of their married life the parties had a community property income by way of compensation for personal services and from certain business enterprises that was "large and far exceeded the community expenses." It also found that George had acquired as separate property 386¾ shares of Broadway Brewing Company common stock, and 153 shares of Acme Brewing Company preferred. The Broadway Brewing stock (386¾ shares) was still in George's estate at the time of his death, is admittedly separate property of George, and was properly excluded from the operation of section 228 of the Probate Code.

The court also found that after the death of Isabella and prior to his own death George "received separate property income" totalling $56,163.23, which included the proceeds of the sale of the 153 shares of Acme preferred, an inheritance of $1,988.08, $30 as juror's fees, and dividends from his separate property securities.

The court next found that during their marriage George and Isabella had accumulated the following as community property: Their home and its furnishings in San Francisco, certain real estate in Contra Costa and Alameda Counties, and money in bank totalling $618.51. In addition to the community income, which exceeded expenses in some unascertained amount, the court found that during the marriage George intentionally, and without the knowledge or consent of his wife, commingled his separate property funds with the community assets in such a manner as to make it impossible to segregate the separate from the community property.

The San Francisco home was sold during probate for $8,236. The parties concede that the proceeds of this sale were properly found to have been community property and that they were properly ordered distributed according to Probate Code, section 228.

The court also held that of the numerous securities found to have been community property at the time of the death of Isabella, all were subsequently sold and the proceeds reinvested except 765 share of Acme common, 578 shares of Union Brewing common, and 13 shares of Blair common. These unsold securities are now found in George's estate.

The court having already found that after the death of his wife and prior to his own death George received "separate property income" totalling $56,163.23, next found that during the same period George "possessed funds from community property sources" totalling $34,601.85. This consisted of $9,342.65 received in dividends and interest on the community property securities, $22,562.34 proceeds from the sale of community property securities, $2,078.35 received from the sale of the Contra Costa-Alameda Counties land, and the $618.51 from the bank.

The court next made a finding to the effect that, although from 1941 until his death in 1951, George was constantly engaged in the buying and selling of securities (and during this period increased his $90,000 investment so that at his death the securities were valued at several hundred thousand dollars), he "at no time was gainfully employed, rendered no valuable services and received no compensation, reward or benefits for his time, effort or services except said $30.00 in juror's fees." The court also found that this increase in value of the so-called residuary assets during these ten years was "due to a general rise in stock market values . . . and not otherwise" and that such "enhancement was not due in

any substantial part to any peculiar knowledge or ability or special effort of said decedent.''

The court found that during the 10-year period following the death of his wife, George devoted all his time to his investments; that he began this buying and selling with the community property assets on hand in 1941 at the death of Isabella, totalling $34,601.85, and later added his own separate property of the value of $56,163.23, so that he ultimately invested and reinvested a total of $90,765.08. At the time of his death he had accumulated by this means $6,018.19 in cash and various enumerated securities called ''residuary assets'' which, together with the properties admitted to be separate or community, were appraised at over $300,000.

From the complete record of George's financial transactions subsequent to 1941 the court determined that because the residuary assets had been accumulated through investment of the commingled $90,765.08, the end product, that is, those securities in George's estate at his death resulting from the investment of the $90,765.08, should be classified in the ratio of $\frac{\$34,601.85}{\$90,765.08}$ or 38.12 per cent community property and $\frac{\$56,163.23}{\$90,765.08}$ or 61.88 per cent as separate property.

But the court did not order the residuary assets distributed under this 61.88 x 38.12 per cent formula. It next found that most of the enhancement in the value of the residuary assets came shortly after the death of Isabella when George was using assets found to have been community property in his investments, and that a smaller enhancement occurred when he was using the assets found to be separate property in his market transactions. The court, therefore, found that it was necessary to give some weight to this factor so that ''the true contributing factors'' would be reflected in the final percentages. In order to accomplish this the court found that it was ''necessary, reasonable and proper . . . to add 6.76% to the 38.12%, making a total of 44.88% and to deduct 6.76% from said 61.88%, making a total of 55.12%.'' Thus of the residuary assets 44.88 per cent was found to be community, thus giving each set of claimants 22.44 per cent of these assets. Of these assets the Adams claimants received 77.56 per cent (55.12 per cent separate, plus 22.44 per cent community), and the Schmitt claimants received 22.44 per cent.

Based on these findings the court ordered the total estate distributed as follows: The 386¾ shares of Broadway Brewing stock, as George's separate property, to the Adams claimants; the $8,236 received upon the sale of the home, the 765 shares of Acme common, the 578 shares of Union Brewing common, and the 13 shares of Blair common, admittedly community property, distributed as such one-half to each group of claimants; and the residuary assets 77.56 per cent to the Adams claimants, and 22.44 per cent to the Schmitt claimants. The administrator on behalf of the Adams claimants appeals, his appeal involving only the residuary assets. The basic contention is that the Schmitt claimants, as a matter of law, did not sustain the burden of proof of showing what property in George's estate had been community property so as to be distributable under section 228 of the Probate Code.

The Adams claimants are correct in contending that the burden involved rested on the Schmitt claimants. These claimants are relatives of the predeceased Isabella. By section 228 they are made statutory heirs of George if they can prove that any property in his estate was in fact the community property of George and Isabella. Such proof is a condition precedent to recovery by them. ■ The proper rule is stated as follows in *Estate of Hanson*, 126 Cal.App.2d 71, 77 [271 P.2d 563] : "It is the general rule that 'where the right of a person as heir depends not merely upon the fact of a certain relationship, but upon the fact of such relationship plus the fact that the property he claims as heir had formerly been either the community property of the decedent and his or her predeceased spouse or else the separate property of the latter, the burden of proof of showing such additional fact rests upon him. It is a fact which must appear in order that he be an heir, and he is an heir only as to property as to which it does appear.' (*Estate of Simonton*, 183 Cal. 53, 60 [190 P. 442]; see, also, *Estate of Rattray*, 13 Cal. 2d 702 [91 P.2d 1042].)"

The Schmitt claimants, as respondents, do not seriously challenge this rule of law, but contend that they have met this burden. Their argument is simply that the court has found that certain properties in the possession of George when Isabella died in 1941 were acquired during the more than 32 years of married life other than by gift, devise, bequest or descent, and were, therefore, the community property of George and Isabella. This determination is supported

by the presumption contained in section 164 of the Civil Code that such property acquired during marriage was community property. By reason of this presumption, which is itself evidence, the Schmitt claimants established a prima facie case, and the burden of proving that the property acquired after marriage and in the possession of George in 1941 was separate property, rested on the Adams claimants. Then, respondents contend, it was proved that the residuary assets found in George's estate in 1951 were the resultant product of numerous investments made with both community and separate funds. The definite proportion of community assets that went into these investments was shown, although admittedly it was impossible, because of the commingling, to trace any specific community or separate dollar into any specific security. But having proved the proportion of community funds that went into the common pool, the trial court was justified, so it is urged, in dividing all of the residuary assets according to this formula. This, say respondents, satisfied their burden of proof. The Adams claimants, as appellants, challenge practically each step in this reasoning.

We agree with respondents that in arguing that there is evidence to support the findings and that they sustained their burden of proof, it is legally permissible to divide the question into two periods—the period when George and Isabella lived together as husband and wife—1908 to 1941—and the period after Isabella's death and up to the death of George —1941 to 1951. We also agree with respondents that the findings that certain properties were the community property of George and Isabella in 1941 are supported by the evidence.

The law on this subject is reasonably clear. Upon the death of Isabella there was in the possession of George various properties that had been acquired during coverture. The Schmitt claimants made no serious effort to trace the sources of the property, but relied principally on the presumption that where separate and community funds are commingled during marriage the whole will be presumed to be community property. [2] This well-settled rule is stated as follows in *Fountain* v. *Maxim*, 210 Cal. 48, 50 [290 P. 576]:

". . . the property here in question, having been acquired during coverture, and taken in the name of the husband, is presumed, under section 164 of the Civil Code, to be community property . . .

"It has also long been the rule in this state that where separate and community property are so commingled that it is impossible to trace the funds, the whole will be treated as community property, upon the principle that the burden is upon the party claiming property is separate property to establish its character as such." (See also *Falk* v. *Falk*, 48 Cal.App.2d 762 [120 P.2d 714]; *Estate of Jolly*, 196 Cal. 547 [238 P. 353]; see cases collected 10 Cal.Jur.2d p. 702, § 35; see discussion and cases collected 1 Armstrong, California Family Law, p. 438 et seq.) The presumption may, of course, be rebutted, and is subject to some limitations. Thus in *Cline* v. *Cline*, 4 Cal.App.2d 626, 629 [41 P.2d 588], it is stated: "It is true that in such a situation, where the separate property cannot be clearly segregated or traced, the community being the paramount estate, draws the whole mass to it. But it is also true that where the community interest is inconsiderable in the property with which it .has been intermingled the community will not draw to itself a separate estate. [Citing cases.]"

 In considering whether the presumption has been rebutted it is also important to consider such factors as whether the community property is adequate to account for the entire estate (*Estate of Smith*, 86 Cal.App.2d 456 [195 P.2d 842]) and whether community expenditures are in excess of community income. (*Estate of Ades*, 81 Cal.App.2d 334 [184 P.2d 1].)

Appellant, on behalf of the Adams claimants, contends that the evidence produced by them demonstrates that the presumption of community character was rebutted in that it shows that almost all of the assets owned on June 2, 1941, the date of the death of Isabella, had as their source the separate property of George. The Adams claimants concede their inability to trace the source of the funds that were used to purchase securities prior to 1939, and so concede that these must be held to be community property. These pre-1939 assets include Transamerica and Bank of America shares, which were sold after Isabella's death, and the Blair Company shares, that are still in George's estate. They also concede their inability to trace the source of the funds used to purchase the Contra Costa-Alameda Counties property. The proceeds from the later sale of this property, they concede, were properly held to be community property. But it is contended that, as to all other securities owned in June of 1941, they had their source in the separate property

of George. They contend that they demonstrated that all investments prior to June of 1941 had their source in six savings accounts. It is worthy of note, although not emphasized by appellant, that these accounts were in the names of George C. "or" Isabella M. Adams. The stock transactions were with Ellsworthy & Company. It is also worthy of note, although unmentioned by appellant, that the account was in both spouses' names. The accountant produced by appellant attempted to take the records of Ellsworthy & Company and compare them with the bank records, and thus tried to prove that on the date a payment was made to the stockbroker a corresponding amount was withdrawn from the bank. Appellant also introduced some cashier's checks that corresponded to some of the transactions.

After having proved to their satisfaction that the securities were purchased from the six bank accounts, the Adams claimants then sought to prove that these bank accounts consisted of dividends from the separate property of George, namely, dividends from the Broadway Brewing Company stock, or redemptions, dividends or sale of the Acme stock, all admitted to be George's separate property. It is contended that the amounts in such accounts not thus accounted for are so inconsequential as to not cause the separate property to lose its character when commingled with the community funds. It is somewhat difficult to ascertain the precise amount of those unaccounted for funds, but there is evidence that they constituted a very appreciable portion of the commingled assets.

Appellant, in his brief, makes a detailed, lengthy and specific analysis of each bank account and claims that his evidence proved beyond a doubt that all but a small amount of the property on hand at Isabella's death had its source in the separate property of George, and that the presumption of community character relied upon by respondents was, as a matter of law, rebutted. We have read this evidence. It is not necessary to summarize it in this opinion. Had it been accepted by the trial court undoubtedly it would have supported a finding that most of such property was the separate property of George. But it was not accepted by the trial court. The trial court found that the securities in question were acquired as community property, thus in effect holding that the presumption contained in section 164 of the Civil Code had not been rebutted. The court expressly found that the amount of community property, including the unaccounted for funds, was "not inconsiderable" as compared to the

separate property with which it was commingled, and that segregation was impossible. ██ As pointed out in *Estate of Smith,* 86 Cal.App.2d 456, 470 [195 P.2d 842] : "This problem of tracing the nature of the property is primarily a factual one, and normally is a question for the trial court" and the question as to whether the presumption contained in section 164 of the Civil Code has "been rebutted is primarily a question of fact." (See also *Berry* v. *Berry,* 117 Cal.App.2d 624 [256 P.2d 646].) ██ Unless the presumption has been clearly rebutted, it alone will support a finding of community character. (*Blank* v. *Coffin,* 20 Cal.2d 457 [126 P.2d 868].)

In the instant case appellant made an impressive showing of original sources in trying to prove the property to be separate, but the conclusions reached are only "reasonable" and not "conclusive." It must be remembered that the trial court found that during marriage the Adamses had "a community property income" which "was large and far exceeded the community expenses." The appellant made no effort to prove the amount of this excess which "far" exceeded community expenses. This undoubtedly made up a part, how much we do not know, of the assets existing at Isabella's death. Moreover, the expert for respondents, Mr. Reardon, did not, as claimed by appellant, admit that the exhibit showing the claimed sources of the assets, was correct. At page 190 of the reporter's transcript he unequivocally testified that he did not agree that appellant's exhibit correctly depicted the source of the funds, stating "I do not agree that the basic source of payment for the securities listed here was the Broadway Brewing dividends. I do agree that it is quite probable that some of the Broadway Brewing dividend moneys were used to purchase some of these, but from what I have seen it is not at all clear to me that they were the exclusive source of the funds"; that there were many deposits in the basic bank accounts that could not be identified as being Broadway Brewing dividends; that (p. 191) "From what I have seen, I don't think they are all Broadway Brewing Company dividends. It is my opinion that they are not Broadway Brewing Company dividends"; that he was able to trace less than half of the bank deposits, and that (p. 192) "more than half of them are not identified." He then testified that from a sound accounting standpoint the conclusions reached by appellant's accountant as set forth in Exhibit V (p. 193) "are not justified," and that no one, from the evidence on hand, could ascertain with any reasonable cer-

tainty the basic source of the money used to purchase the securities. Although Reardon made some concessions as to the accuracy of the tracing of the bank transactions by appellant's accountant, such concessions were qualified. Thus he stated that he was willing to accept appellant's analysis of a particular transaction only if he could presume that unidentified deposits and withdrawals were to be disregarded. (See R.T. pp. 255, 264, 268-9.) He testified time and time again that it was impossible to segregate the separate from the community property, which testimony supports the presumption. (*Falk* v. *Falk*, 48 Cal.App.2d 772 [120 P.2d 720].) The point under discussion need not be further labored. It is quite clear that the findings of the trial court in reference to the community property existing at the time of Isabella's death in June of 1941 are amply supported.

But this is not decisive of the issues presented on this appeal. After having determined the amounts of separate and community property that existed in 1941, the court then determined that the residuary assets existing in 1951, totalling several hundred thousands of dollars, had resulted from commingling some $34,000 of community property with about $56,000 of separate property. Although the community property, after Isabella's death, had been invested before the separate property, although after the separate property had been invested George had engaged in literally hundreds of transactions (a total of 473 after Isabella's death), although admittedly on some transactions losses were incurred and on others gains made, and although it was impossible to trace any specific separate or community dollar into any specific security found in George's estate, the court determined that there should be, subject to a weighting in favor of the community property, a proportional segregation of the generalized assets based upon the proportions of separate and community funds that went into the common pool.

Before discussing this method of tracing assets, it should also be mentioned that the trial court also found that, although the record shows that from 1941 to 1951 George spent all his time in supervising his investments, during which period the assets increased in value from $90,000 to several hundred thousand dollars, no portion of the increase was due to his efforts. The precise finding is as follows:

"After the death of his wife and prior to his death, said George Charles Adams at no time was gainfully employed,

rendered no valuable services and received no compensation. . . .

"During all of this time he confined his business activities to and continuously engaged in the field of investment, buying, selling and reinvesting in securities. . . .

"Due to a general rise in stock market values following the death of Isabella Schmitt Adams, and not otherwise, the aggregate value of said residuary assets at the time of the death of George Charles Adams was far in excess of said sum of $90,765.08. Said enhancement was not due in any substantial part to any peculiar knowledge or ability or special effort of said decedent."

■ Of course, it is elementary, that any increase in value in community or separate property, due to no efforts of the possessor, partakes of the nature of the original property. But enhancement of value caused by the efforts of the person possessing it must be treated as separate or community earnings dependent upon the status of the person at the time the services were rendered. Here, any increase in value caused by the efforts of George between 1941-1951, since he was then a widower, would be his sole and separate property. Although the original investment was more than doubled in 10 years, the court found that this increase was not due to the efforts of George, but due "to a general rise in stock market values." In other words, had George simply bought stocks at random, or kept his original stocks, he would have increased his capital assets in the same proportion. Such finding is unsupported by any believable evidence or inference.

The record shows, without conflict, that after the death of Isabella, George devoted his full time to market speculation, worrying, working and risking his capital in order to increase its value; that he was an active trader, engaging in some 473 transactions; that many times George would take a loss on a particular investment in order to get cash to make some other investment; and that George was clever in this type of transaction. His broker opined that he was an able and skilled trader. Admittedly, during the 10-year period, there was a general market rise, but not sufficient to account for the increase in values here involved. It is contrary to common experience to conclude that, even during a general rise in market values, a random purchasing of stock will necessarily result in making a profit. The record shows actual losses suffered on numerous transactions. If stock trading were as simple as that, there would have been no losses at all during

the 10-year-period, and yet we know that that was not the fact. The court should have devised some formula by which the proportion of the increase due to the efforts of George between 1941-1951 could be computed and should have awarded this amount to the Adams claimants as separate property of the deceased. This alone would require a reversal.

But there is a much more fundamental reason why the decree must be reversed, and that is that the respondents did not sustain their burden of proof in tracing the community assets of 1941 into the residuary assets of 1951—in other words, the proportional formula worked out by the trial court cannot be upheld.

There are many anomalies presented in interpreting and applying sections 228 and 229 of the Probate Code. (See Ferrier, Rules of Descent under Probate Code Sections 228 and 229; 25 Cal.L.Rev. 261.) ▇ Not the least of these is that, although upon the death of the wife, intestate, where the husband acquires all of the community property, he becomes the absolute owner of it, so that there no longer is community property in the true sense, nevertheless for purposes of succession under section 228 of the Probate Code, "the statutory provisions determining what is community property as construed by our decisions remain in force and applicable throughout the life of the surviving spouse, as to all property constituting community property of the spouses at the time of the death of the predeceased spouse." (*Estate of Brady*, 171 Cal. 1, 7 [151 P. 275].) ▇ But when the surviving spouse dies intestate, the presumption is that all property in his estate is his sole and separate property, and the one claiming it to be community must assume the burden of proving what portion of that estate was in fact the community property of the two parties at the time of the death of the predeceased spouse. This does not mean that such claimant must prove that the identical property did not change form after the death of the predeceased spouse (*Estate of Brady*, 171 Cal. 1 [151 P. 275]), but it does mean that the burden of tracing the property into the estate of the surviving spouse is on the ones claiming it to be community property. ▇ If, after the death of the predeceased spouse, the surviving spouse commingles the community property with his separate property so that it cannot be traced to its origin as part of the community property, the heirs claiming under Probate Code, section 228, have not sustained their burden, and the entire commingled property will be treated

as the separate property of the surviving spouse. (*Estate of Simonton*, 183 Cal. 53 [190 P. 442]; *Estate of Moore*, 65 Cal. App. 29 [223 P. 73]; *Estate of Harris*, 9 Cal.2d 649 [72 P.2d 873]; *Estate of Rattray*, 13 Cal.2d 702 [91 P.2d 1042]; see cases collected 3 Cal.Jur. 10-Yr.Supp. p. 699.)

In the normal case, such as the instant one, the husband and wife live together many years (here over 32), and then one spouse dies. The other lives for some time (here 10 years). During that period the surviving spouse commingles what was formerly the community property and his separate property. Upon his death intestate the heirs of the wife who, by virtue of section 228, become the statutory heirs of the husband, are entitled under that section in the circumstances there set forth, to one-half of the property that was formerly community property. But the burden is on them to prove what was community property, and to trace it into the estate of the surviving spouse. That burden requires two steps in the proof. First, as already pointed out, the predeceased spouse's heirs must prove what portion of the property was community property at the time of the death of the predeceased spouse. In making that proof, as already held in this opinion, the presumption is that property acquired or in possession during the marriage was community property. Then the heirs of the predeceased spouse have the burden of tracing the community property into the property found in the estate of the surviving spouse. In meeting this burden such heirs now find the presumptions reversed. Now the presumption is, that the property in the estate of the surviving spouse is the separate property of the surviving spouse, and, under the rule of the cases cited above, the heirs of the predeceased spouse must overcome that presumption by tracing the community property existing at the death of the predeceased spouse into the estate of the surviving spouse. Failing to so trace the community property by overcoming the presumption of separate character, the property in the estate of the surviving spouse must be treated as the separate property of the surviving spouse and distributed to his blood heirs.

In determining whether the heirs of the predeceased spouse have sustained this burden, the ordinary rules applicable to tracing property apply. Ordinarily the question is one of fact, and if the finding of the trial court is supported by substantial evidence, or any reasonable inference from the evidence, the finding of the trial court will be upheld. (*Estate of Smith*, 86 Cal.App.2d 456 [195 P.2d 842].)

 Thus, if the first spouse dies after a long married life, and shortly thereafter the surviving spouse dies, there being no evidence that the surviving spouse was gainfully employed, the inference that the property was community will support the finding to that effect. (*Estate of Bryant*, 3 Cal.2d 58 [43 P.2d 529].) Evidence that the surviving spouse over a 10-year period received no gift or income that could be characterized as separate will support the inference that the property that was community on the death of the predeceased spouse remained such until the death of the surviving spouse. (*Estate of Jolly*, 196 Cal. 547 [238 P. 353].) But directly or indirectly the one claiming that the property is community must sustain the burden of proof. In *Estate of Moore*, 65 Cal.App. 29, 33 [223 P. 73], the appellate court stated: "In the first place, if we view all of the evidence mentioned and give it all of the force which it is entitled to, it does not carry the inference that after Mary Ellen Moore received the $16,000, from her husband's estate that she preserved the same in kind, or that she invested the same in any particular security, or reinvested the same in any particular security. It may equally be inferred that she so mingled those moneys with her other properties that they cannot now be traced to their origin as a part of the community property. When such conflicting inferences may be drawn from the proof, then there is nothing for the jury, or the trial court sitting without a jury, but mere guesses and conjectures, and upon these no verdict or decision can be founded." The court commented on the failure to trace any particular security in the estate of the surviving spouse into the community property existing at the death of the predeceased spouse, and held that such failure was fatal. That is quite similar to the existing case.

In the present case the court had before it several hundred thousands of dollars of securities constituting the so-called residuary assets. All of them had been purchased after the death of Isabella. They were presumably the sole and separate property of George. All the respondents proved was that over a period of ten years George commingled about $34,000 of community property with about $56,000 of separate property. The trial court held that this was a sufficient tracing, and that the generalized assets should be divided in proportion to the sources of the funds by which the residuary assets had been purchased. This formula has a de-

ceptive appearance of simplicity and fairness, but upon analysis is found to be legally unsound. Such evidence is not sufficient to sustain a finding, under the evidence here, that the resultant generalized assets were community or separate in proportion to the properties that had gone into the common investment pool.

This concept of proportional segregation cannot be here upheld where the property has been transposed many times in some 473 transactions, where the community property was invested at times different from the separate property, and where on some transactions losses were incurred and on others profits were realized. The proportional segregation theory has been applied in several divorce cases where the court was dealing with fungible assets, or assets that could be traced into a definite distinct asset. (*Faust* v. *Faust,* 91 Cal.App.2d 304 [204 P.2d 906] ; *Jenkins* v. *Jenkins,* 110 Cal. App.2d 663 [243 P.2d 79] ; *Thomasset* v. *Thomasset,* 122 Cal. App.2d 116 [264 P.2d 626] ; *Estate of Ab'dale,* 28 Cal.2d 587 [170 P.2d 918].) But none of these cases dealt with assets that had been invested and reinvested and thus transmuted many times after the death of the predeceased spouse. In those cases there had been no complex transmutation of assets. There had merely been enhancement in value or profits or issue traceable to the original property. In such cases, obviously, the proportion of contributions remains constant. But this is entirely different from a situation where shares of stock in an estate are the result of hundreds of investments and reinvestments, and tracing is impossible. (See *Falk* v. *Falk,* 48 Cal.App.2d 762 [120 P.2d 714] ; *Falk* v. *Falk,* 48 Cal.App.2d 772 [120 P.2d 720].)

The trial court undoubtedly attempted to reach an equitable solution. But this disarming appearance of fairness disappears when the nature and extent of the burden of respondents is considered. They were required to trace the community property into the estate of George. All they did was to trace the proportional contribution to the common pool. Under the trial court's theory tracing would become simply a matter of fixing the amount of contribution regardless of misfortune or luck or chance. The nature of the assets as they changed in quality or number would become immaterial. If this were the law the courts in innumerable tracing cases indulged in unnecessary work to trace the property into specific assets.

The decree appealed from is reversed with directions to

the trial court to divide the estate in accordance with the views herein expressed.

Bray, J., and Wood (Fred B.), J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 8, 1955.