ESTATE OF EDNA MAE RIDENOUR, DECEASED, PATRICK HENRY RIDENOUR, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ridenour v. Commissioner
Docket No. 7998-75.
United States Tax Court
T.C. Memo 1978-342; 1978 Tax Ct. Memo LEXIS 171; 37 T.C.M. (CCH) 1416; T.C.M. (RIA) 78342; August 30, 1978, Filed Edgar A. Nathan, For the petitioner. John O. Kent and Charles O. Cobb, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in estate tax of $ 45,423.47 and an addition to tax under section 6653(b), I.R.C. 1954, [1] in the amount of $ 22,711.74. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether stocks and bonds owned by Edna Mae Ridenour and her husband, Patrick H. Ridenour, at the date of Mrs. Ridenour's death were community property so that one-half of their fair market value was part *173 of Mrs. Ridenour's gross estate and whether certain accounts receivable were community property so that one-half of the value thereof at the date of Mrs. Ridenour's death is properly includable in her estate; (2) Whether respondent is estopped from introducing evidence to show an addition to tax for fraud in this case because of the statement of the court in the criminal case against Mr. Ridenour in which he was acquitted of criminal fraud; (3) whether a part of the underpayment of tax required to be shown on the estate tax return was due to fraud; and (4) whether the value of the assets omitted from the gross estate reported on the return exceeds 25 percent of the value of the gross estate so that the 6-year period of limitation provided for in section 6501(e)(2) is applicable. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Edna Mae Ridenour died on March 7, 1968, and Patrick H. Ridenour was appointed and is the executor of her estate. Mr. Ridenour resided in La Verne, California at the time the petition in this case was *174 filed. An estate tax return was filed for the estate of Edna Mae Ridenour on November 20, 1968. This return was signed by Patrick H. Ridenour as executor. The due date of the return under the then applicable law [2] was June 7, 1969, 15 months from the date of Mrs. Ridenour's death. Patrick H. Ridenour and Edna Mae Ridenour (hereinafter sometimes called decedent), were married on July 25, 1941, in Okmulgee, Oklahoma. They moved to California in 1946. At the time they moved to California their total assets were $ 5,000 or less. After 1946, Mr. and Mrs. Ridenour's domicile remained in California although he worked in Brazil between 1951 and 1960 for a construction company. From 1962 through March 7, 1968, Mr. Ridenour was employed by Jelco, Inc., a major construction company. During a portinn of this time he was vice president in charge of construction projects. Although Mr. and Mrs. Ridenour's domicile remained in California, Mr. Ridenour was required to be away from home for substantial periods of time because the construction projects at Jelco were in various locations in the WesternUnited States *175 and Canada. In 1962, Mr. and Mrs. Ridenour were having marital difficulties and in July of that year Mrs. Ridenour filed for a divorce in Pasadena, California. In November of 1962 Mr. and Mrs. Ridenour were reconciled and the divorce action was dismissed early in 1963. Thereafter Mr. and Mrs. Ridenour again had marital difficulties. During 1964, because of these marital difficulties, they made an oral agreement to divide their community property. Mr. and Mrs. Ridenour had approximately $ 41,000 in a savings account. Mrs. Ridenour had withdrawn $ 40,000 of this amount. Under the oral agreement she was to keep the $ 40,000 she had withdrawn and the home, furniture and car were to be hers. Pursuant to this agreement, Mr. Ridenour deeded his interest in the home to Mrs. Ridenour. The home had been purchased in 1962 and at the time Mr. Ridenour deeded his interest to decedent in 1964 it had a fair market value of approximately $ 30,000. The remaining property, which was primarily cash of between $ 70,000 and $ 100,000, was to be Mr. Ridenour's property. Mr. and Mrs. Ridenour were never legally separated and there was no court order or written agreement with respect to their *176 separation or division of property.Decedent was not employed outside of the home in 1962 or any time thereafter. Mr. Ridenour continued, during the entire period from 1962 until decedent's death, to pay all living expenses for decedent and their son. In 1965 Mrs. Ridenour had an operation for cancer. At about the time of decedent's cancer operation Mr. Ridenour returned to the home in which Mrs. Ridenour was living and he took care of her during her illness. After the operation Mr. Ridenour was informed by the doctors that the operation had been successful. In 1966, about 6 months after the first operation, Mrs. Ridenour had a second cancer operation. Mr. Ridenour again lived in the home with her and took care of her during this operation. After the second operation the doctors informed Mr. Ridenour that the operation had not been successful and that Mrs. Ridenour had terminal cancer. Mr. Ridenour thereafter remained with Mrs. Ridenour until the time of her death. During 1966, Mr. Ridenour and decedent agreed that Mr. Ridenour would quitclaim his interest in a note payable to them jointly to Mrs. Ridenour and also that he would place money into their joint bank account. *177 Mr. Ridenour and decedent had a joint checking account at the San Gabriel Branch of the United California Bank which had been opened on March 27, 1962. Mr. Ridenour transferred the note to decedent because of decedent's concern about her security and that of their son.Also, she stated to Mr. Ridenour that he had taken more of the money than she had when they had divided their property. Thereafter Mrs. Ridenour told Mr. Ridenour that she would like to place all their property back together. Following this discussion with Mrs. Ridenour, Mr. Ridenour went to the law firm that handled the business for Jelco, Inc. for advice. He was referred to one of the partners in the firm. He explained his wife's condition to this attorney and asked him what he could do to alleviate her concern about the financial security of herself and their son. The attorney suggested that perhaps contract wills would be the best way to handle their property. Mr. Ridenour then talked to decedent about making contract wills and also about putting their money back together. Because of decedent's physical condition and her desire to put their property back together, Mr. Ridenour agreed to put their property *178 back together. In August 1967 Mrs. Ridenour executed a will leaving everything to her husband if he survived her and if he did not or died within 60 days after the date of her death everything was left to their son Terry. She named Mr. Ridenour as the executor. The fourth and last paragraph of this will provided: FOURTH: My husband has executed or in the near future will execute his Last Will which provides, or will provide, that if I survive him, he gives all of his property and estate to me and that if I predecease him, he gives all of his property and estate to our son, Terry Lee Ridenour. My husband and I have agreed to execute our Wills as aforesaid and I have executed this Will in accordance with our agreement. My husband and I have agreed further that neither of us, by codicil or otherwise, shall make any change in his or her Will so executed except with the written consent of the other and that in no event shall the survivor of us, after one of us dies, make any change whatever in such survivor's Will. On June 7, 1967, two stock accounts were opened at the brokerage firm of Morgan, Olmstead, Kennedy and Gardner (Morgan, Olmstead) in Los Angeles, California in *179 the names of Mr. Ridenour and decedent as joint owners with the right of survivorship.One of these accounts was a cash account and the other a margin account. Mr. Ridenour agreed to put the stocks in the joint account in order to give decedent peace of mind. For approximately 4 months preceding her death Mrs. Ridenour was in a coma. On September 29, 1967, Mr. Ridenour opened a cash stock account at Morgan, Olmstead in his name alone and on October 3, 1967, he opened a margin account in his name alone. He told the broker at Morgan, Olmstead who handled his accounts that he was opening the separate accounts because it was becoming progressively more difficult for decedent to sign stock certificates and other papers necessary to conduct security transactions. On their 1965 joint Federal income tax return Mr. and Mrs. Ridenour reported dividends from American Telephone and Telegraph stock and Life Insurance Investors Fund stock. On the return they indicated that the American Telephone and Telegraph stock was owned by Mr. Ridenour and the Life Insurance Investors Fund stock was owned jointly. On their 1966 joint Federal income tax return they reported dividends from American *180 Telephone and Telegraph stock which was indicated to be owned by Mr. Ridenour and dividends from Life Insurance Investors Fund stock, part of which was indicated as owned by Mr. Ridenour and part by Mrs. Ridenour. On their 1967 joint Federal income tax return Mr. and Mrs. Ridenour reported dividends from American Telephone and Telegraph and Life Insurance Investors Fund stocks. There was no indication on this return which of them owned the stocks, and a $ 200 dividend exclusion was taken on the return. For the year 1968, Mr. Ridenour filed a separate return for himself and for Mrs. Ridenour showing that she was deceased on March 7, 1968. On these returns all income and losses, including all dividends received and gains or losses from sales of stock, were shown as community income or community losses. On these returns sales of some stocks that had been acquired in 1967 which had initially been in the joint account of Mr. and Mrs. Ridenour were reported. From 1960 when he returned from Brazil through 1964, Mr. Ridenour earned approximately $ 20,000 a year. These earnings of Mr. Ridenour were most of the Ridenour's income for these years. For the years 1965 through 1967, *181 Mr. and Mrs. Ridenour reported the following income in their joint Federal tax returns: 1965
1966
1967
Wages and salaries
$ 26,142
$ 26,000
$ 23,750
Other income [3]
(3,722)
27,978
47,980
Mr. and Mrs. Ridenour's joint returns for each of these years were signed as prepared by A.S. Rogers. Mr. Ridenour's separate 1968 return reported total income of $ 133,942, computed as follows: Wages
$ 134,113
Other income
(171)
Total income
$ 133,942
The sources of the reported income were explained as follows: [4] Employer's Name
Total Wages
Western Industries Inc.
$ 21,000
Jelco Inc.
247,225
Total
$ 268,225
Husband's 1/2 Community Property
$ 134,113
Wife's 1/2 Community Property
134,112
*182 Capital
Ordinary
Total
Gains
Dividends
Total Dividend Income
$ 2,388.64
$ 1,399.42
$ 989.22
Husband's 1/2
Community Property
1,194.32
699.71
494.61
Wife's 1/2
Community Property
1,194.32
699.71
494.61
Total Interest Income
1,558.00
Husband's 1/2
Community Property
779.00
Wife's 1/2
Community Property
779.00
Net short-term gain (or loss)
$ (11,449)
Long-term capital gain
6,805
Capital gain dividends… 1/2
Community Property
700
Net long-term gain (or loss)
7,505
Net gain (or loss)
(3,944)
Capital loss claimed
(1,000)
Mrs. Ridenour's separate 1968 return reported total income of $ 133,941, computed the same as Mr. Ridenour's. These returns were also prepared by A.S. Rogers. On June 8, 1967, cash in the amount of $ 14,200 was deposited in Mr. and Mrs. Ridenour's joint stock account at Morgan, Olmstead, and on June 8, 200 shares of American Telephone and Telegraph stock were received into this account. On June 14, 451 shares *183 of Life Insurance Investors and 40 shares of 1000ths Life Insurance Investors were received into the joint account. Thereafter there were a number of purchases of stock which were held in the two joint accounts of Mr. and Mrs. Ridenour. During November 1967, Mr. Ridenour began to transfer securities from the joint cash account that he and Mrs. Ridenour had at Morgan, Olmstead to his individual account and also began to make transfers from the margin account to his individual margin account. This practice continued through 1968. During the latter part of 1966 Mr. Ridenour and Alton M. Jones formed a partnership to lease equipment to Jelco, Inc. The name of the partnership was California Equipment Rental Company. In February 1967 a checking account was opened at the Beverly Hills National Bank in the name of California Equipment Rental Company and Mr. Ridenour was one of the authorized signators on the account. On November 22, 1967, Mr. Ridenour deposited $ 72,904.80 into his and Mrs. Ridenour's joint checking account at United California Bank. The funds deposited in this account came from the Beverly Hills National Bank account in the name of California Equipment Rental Company. *184 During the period November 27, 1967, through December 29, 1967, Mr. Ridenour deposited checks drawn on the joint checking account which he and Mrs. Ridenour had at United California Bank into the cash account in his name alone at Morgan, Olmstead totaling $ 72,071.88. As of October 27, 1967, the brokerage statement of the joint cash account of Mr. and Mrs. Ridenour at Morgan, Olmstead showed the following stocks due the Ridenours: 500
Airlift International
451
Life Insurance Investors, Inc.
40
1000ths Life Insurance Investors, Inc.
500
W.T.C. Air Freight
100
Western Union International
As of this same date the following stocks were shown as due to Mr. and Mrs. Ridenour in their margin account: 200
American Machine and Foundry Company
200
U.S. Industries
100
V.S.I. Corporation
The following schedule shows the securities with accrued interest and dividends which were held either in the joint accounts of Mr. and Mrs. Ridenour or in the separate accounts opened by Mr. Ridenour on September 29 and October 3, 1967, as of March 7, 1968, the date of Mrs. Ridenour's death: Schedule of Securities Shares or
Unit
Date of Face Value
Value
Death Value
200
AMERICAN MACHINE AND FOUNDRY CO.
$ 18.9375
$ 3,787.50
plus accrued dividend
45.00
5,000
AIRLIFT INTERNATIONAL - 1987
76.00
3,800.00
plus accrued interest
74.39
750
AIRLIFT INTERNATIONAL
5.75
4,406.50
400
KING BROTHERS INDUSTRIES, INC.
28.875
11,550.00
$ 4,000
LIN BROADCASTING 5-1/2% 1982
103.50
4,140.00
plus accrued interest
95.33
100
LUM'S INCORPORATED
41.25
4,125.00
$ 5,000
LUM'S INCORPORATED 5% 1987
125.00
6,250.00
plus accrued interest
66.67
400
MANAGEMENT ASSISTANCE
11.8125
4,725.00
200
MURPHY PACIFIC MARINE
14.1875
2,837.50
2,000
OTIS OIL AND GAS CORP.
.60
1,200.00
400
SOVERIGN LIFE INS. CALIF.
64.50
25,800.00
1,000
STOCKMAN LIFE INS. CO. OF AMERICA
1.25
1,250.00
300
20th CENTURY FOX FILM
27.00
8,100.00
400
WTC AIR FREIGHT
12.375
4,950.00
400
WAGNER INDUSTRIES
15.05
6,025.00
200
WESTERN UNION INTERNATIONAL
34.5625
6,912.50
400
UNITED STATES INDUSTRIES
41.00
16,400.00
3,334.2429
ENTERPRISE FUND, INC.
7.48 Bid
24,940.14
162.88
MASSACHUSETTS INVESTORS TRUST
15.13 Bid
2,464.37
Total Value of Stocks and Bonds
$ 143,944.90
*185 Of the above listed securities, only the 200 shares of American Machine andFoundry Co. and the 162.88 shares of Massachusetts Investors Trust remained in the Ridenours' joint name at the date of Mrs. Ridenour's death. After Mrs. Ridenour's death, Mr. Ridenour again went to the law firm that had drawn his and Mrs. Ridenour's wills which had been executed in August 1967. On March 27, 1968, he met with the same attorney who had drawn their wills.This attorney had a short discussion with Mr. Ridenour about the property he and Mrs. Ridenour owned, primarily for the purpose of making an inventory for state inheritance tax. The attorney took some notes. These notes referred to motels, partnership interests, cash and safe deposit box, furniture, home purchase in May 1962 and the name of the person that did the accounting on the sale of the motels. The second page of these notes read as follows: Net Worth
Married in Oklahoma
1941
5,000
Came to California
1946
14,000
Went to Brazil
1951
115,000
Returned to California
1960
Invested in home, motels (lost 50,000 on the sale) 130,000
Today
Thereafter these notes were referred by the *186 partner in the law firm with whom Mr. Ridenour spoke to an associate who prepared decedent's estate tax return. This associate had a number of telephone conversations with Mr. Ridenour and then forwarded him the estate tax return to sign. The estate tax return prepared by the attorney and signed by Mr. Ridenour reported the home valued at $ 40,000 as the separate property of Mrs. Ridenour; reported certain interest in promissory notes as community property, one-half includable in Mrs. Ridenour's estate; reported the furnishings and equipment in the home valued at $ 1,000 as one-half the community interest of Mrs. Ridenour; reported as community property three bank accounts totaling $ 30,258.89 as transfers during decedent's life-time, two in the joint names of Mr. and Mrs. Ridenour and one in the name of the decedent as trustee for their son Terry, one-half of the $ 30,258.89 being included in Mrs. Ridenour's estate; and reported cash in the safe deposit box and a savings account in the American Temple City Bank as community property, one-half includable in Mrs. Ridenour's estate. An unsecured promissory note valued at $ 17,947.49 was reported as Mrs. Ridenour's separate property. *187 No stocks and bonds were reported.The total gross estate as reported was $ 82,047.56, consisting of the following items, all of which, except the home and the $ 17,949.49 were reported as community property: SCHEDULE O RECAPITULATION Sched-
Alternate
Value at ule
Gross estate
Value
Date of Death
A
Real estate
$ 40,000.00
B
Stocks and bonds
0
C
Mortgages, notes and cash
19,689.68
D
Insurance
0
E
Jointly owned property
6,678.43
F
Other miscellaneous property
550.00
G
Transfers during decedent's
life
15,129.45
H
Powers of appointment
0
I
Annuities
0
TOTAL GROSS ESTATE
$ 82,047.56
After the estate tax return had been filed and in connection with reviewing the California inheritance tax report which had been previously filed listing the home and note as Mrs. Ridenour's separate property, the attorney who prepared the estate tax return decided that all of the property which Mr. and Mrs. Ridenour had at the date of Mrs. Ridenour's death was community property. In a letter dated December 5, 1968, to the California Inheritance Tax Appraiser handling decedent's estate, Mr. Ridenour's attorney stated *188 as follows: 4. The decedent acquired her separate interest in Items 3 and 5 of the inventory pursuant to an informal property settlement pending a divorce from Mr. Patrick Ridenour. The divorce was never consummated. Mrs. Ridenour had filed for divorce and both parties had obtained counsel. Shortly thereafter, through negotiations conducted by their attorneys, Mr. Ridenour executed a deed quitclaiming his joint tenancy interest to his home to his wife as her separate property. This deed is dated July 21, 1964, and was prepared by the wife's attorneys, Shatford and Shatford. In addition, Mr. Ridenour conveyed his interest in the motel which is the subject of the promissory note and deed of trust to his wife as her separate property. Shortly thereafter, the parties reconciled but no effort was made to re-transfer the properties on a formal basis. The parties continued to occupy the home as husband and wife and the proceeds from the promissory note listed as Item 5 of the inventory were used for community obligations. In discussing this matter with Mr. Ridenour, it would seem that it was the intent of the parties that the conveyances were to be effective only if the divorce *189 was consummated. Subsequent conduct of Mr. and Mrs. Ridenour would seem to indicate that the property, if it became Mrs. Ridenour's separate property, was nevertheless returned to its original community status.If your auditors agree with this position, I will file a corrected inventory. * * * The same attorney who wrote the letter filled out and Mr. Ridenour executed under date of February 27, 1969, an inheritance tax affidavit in which he in effect stated that all the property which decedent held on the date of her death was community property. Much of the affidavit dealt with the explanation of maintaining a residence in California while Mr. Ridenour was employed in Brazil.
Mr. Ridenour was a member of a partnership named J.R.H. Company. Other members of the partnership were Alton Jones and Richard Hart. During the period November 1, 1966 through August 20, 1967, the partnership earned a net profit of $ 26,533.24. Mr. Ridenour's share of this profit was $ 6,633.31. On June 9, 1967, Mr. Ridenour received a check for $ 2,866.50 as part of his share of the profits and on March 28, 1968, he received another check for $ 3,766.81 in payment of the balance of his profits for the *190 period November 1, 1966 through August 20, 1967. Mr. Ridenour did not report the amounts received from the J.R.H. Company partnership on the joint Federal income tax return he filed with Mrs. Ridenour in 1967, on his separate return or decedent's separate return for 1968, or on decedent's estate tax return. In February 1974, Mr. Ridenour had a conference with a special agent of the Internal Revenue Service and an estate tax examiner of the Service with respect to the estate tax return he had filed for decedent's estate. Prior to going to this conference Mr. Ridenour consulted his attorney but the attorney did not accompany him to the conference. At the conference the special agent informed Mr. Ridenour of his rights not to answer questions and to consult an attorney, and that anything he said might be held against him. At this conference Mr. Ridenour was asked about stocks that he owned or that he and Mrs. Ridenour owned at the date of Mrs. Ridenour's death. He informed the special agent about the small amount of Massachusetts Investors Trust stock he and Mrs. Ridenour owned, but said that he did not think he owned or he and Mrs. Ridenour owned any other stock at the date of *191 her death. He did, at the agent's request, furnish the agent with the name of his stockbroker. He also stated to the agent that the brokerage firm had made certain purchases and sales of stock for his account without his knowledge. No such purchases and sales without Mr. Ridenour's knowledge were made at any time prior to Mrs. Ridenour's death. Mr. Ridenour was tried and acquitted before a judge sitting without a jury for willfully attempting to evade taxes due on decedent's estate tax return in the case of United States v. Ridenour, No. 74-1632F (C.D. Calif. 1975). No written opinion was rendered in the case, but at the conclusion of the case the court stated as follows: THE COURT: An ordinary working man walks into one of the most prestigious law firms in Los Angeles and is introduced, not because of the amount of his estate but because he -- they want to keep the corporate client, and he ends up in the office of one of the senior partners in charge of the Tax Division and as a result of that advice contract wills are executed between Mr. Ridenour and Mrs. Ridenour, wills which clearly have the force and effect that not only are we concerned with joint property or community *192 property, we are concerned with separate property of both sides because that is the purpose of a contract will. The separate estate of each party is more important in the contract will than the joint property. Then Mrs. Ridenour dies after there were divorces and reconciliations and transfers of property, oral understandings between the parties and she dies and he goes back to the same prestigious law firm and assumptions are made, you know. Assumptions are made. The whole purpose of a contract will was that the lawyers had an obligation to protect the beneficiary of those wills and they had an absolute duty and responsibility to find out every single piece of property that Mr. Ridenour ever owned and traced it to its present day because that is the purpose of a contract will. Two parties contracted that when they both died somebody is going to end up with it, one specific isolated person, is going to end up with everything. And not one single question is asked, not one single question about any part of his property except an assumption that here is an estate of $ 130,000.He probably looks like that kind of a person who could never acquire more than $ 130,000. Then they *193 send him to a junior partner, an assistant, and he assumes from a cryptic statement made on a short piece of paper that that is all the estate was worth, that is all the beneficiary in the future was ever going to receive. What does an ordinary, average American citizen have to do beyond that? He did not hide in one single iota any piece of property he ever owned.And what does he do? He ends up with a stockbrokerage firm and they end up with the estate planning program. You talk about people who are susceptible to the inadequacies of professional people, this is a classic case. If this were a civil case there would be no question in my mind that judgment would be in favor of the Government for $ 9,000 or whatever it amounts to. No question about it. But this is a criminal case in which I have to find beyond a reasonable doubt that Mr. Ridenour acted with bad purpose to disobey the law.Bad purpose. His conduct before the Internal Revenue Agents, however, was atrocious and I cannot feel sorry for him at all because he had to bear this expense and trauma of going to trial. But when he prepared the Estate Tax Return he was not -- he had a good-faith valid assumption in the *194 things that he believed in at that time and that was that those stocks were his separate property. If only the lawyers had asked him in accordance with their duties and obligations as the preparers of those contract wills, this whole problem would never have happened. All right. The defendant will be acquitted. Respondent in his notice of deficiency determined that there had been omitted from the property reported on the estate tax return $ 71,972.45 representing the community interest of Mrs. Ridenour at the date of her death in stocks and bonds which she and Mr. Ridenour owned as community property which had a total value of $ 143,944.90. Respondent also increased the estate as reported by Mrs. Ridenour's community interest in an account receivable from the J.R.H. Company partnership in the amount of $ 1,883.40 and by the amount of $ 2,655.70 as brokerage accounts receivable as well as making certain other adjustments no longer in issue. Respondent on June 3, 1975, mailed to petitioner the notice of deficiency which forms the basis of this case. ULTIMATE FINDINGS OF FACT
1. The stocks and bonds held in the two joint brokerage accounts of Mr. and Mrs. Ridenour and *195 the two separate brokerage accounts of Mr. Ridenour at the date of Mrs. Ridenour's death were community property of Mr. and Mrs. Ridenour and one-half of the value thereof at the date of her death ($ 71,972.45) is properly includable in Mrs. Ridenour's gross estate. 2. The account receivable from the J.R.H. Company partnership and the brokerage accounts receivable at the date of Mrs. Ridenour's death are community property and one-half of the total of the accounts receivable are properly includable in Mrs. Ridenour's gross estate. 3. Respondent is not estopped from attempting to prove fraud in this case by the decision of acquittal of Mr. Ridenour in the criminal case. 4. Respondent has not shown by clear and convincing evidence that a part of the underpayment of tax by the estate was due to the fraud of the executor with intent to evade the tax. 5. There was an omission from the gross estate as reported on the estate tax return of an amount in excess of 25 percent of the amount of gross estate reported and therefore the 6-year statute of limitations provided for by section 6501(e)(2) is applicable. OPINION *196 Under California law property acquired by either spouse during marriage unless otherwise specified by statute or an agreement of the spouses is community property. [5] Community property is the rule and all property acquired during marriage is presumed to be community property unless evidence is provided to show otherwise. In re Jolly's Estate,238 Pac. 353, 355 (Cal. Sup. Ct. 1925). Under the California law in effect at the date of Mrs. Ridenour's death when a husband and wife without a court order were living separate and apart, the earnings of the wife were her separate property but the earnings of the husband remained community property. [6]
*197 In California a husband and wife may make valid oral agreements with respect to the status of their property. Doxsee Co. v. All Persons,45 Pac. 2d 192, 194 (Cal. Sup. Ct. 1935). By oral agreement the parties may divide their community property into separate property or transmute their separate property into community property. Mooney v. Mooney,204 Pac. 2d 630 (Cal. Sup. Ct. 1949):, In re Kelpsch's Estate,265 Pac. 214 (Cal. Sup. Ct. 1928); Wikes v. Smith,465 F.2d 1142, 1146 (9th Cir. 1972). Under California law a husband and wife may hold property as joint tenants or tenants in common. [7] However, the form of the instrument under which the spouses hold property is not conclusive and property acquired under joint tenancy deed may in fact be community property. Socol v. King,223 Pac. 2d 627, 629 (Cal. Sup. Ct. 1950). A community estate and joint tenancy cannot exist at the same time. Siberell v. Siberell,7 Pac. 2d 1003, 1005 (Cal. Sup. Ct. 1932). *198 The intent of the parties with respect to the status of their property requires a factual determination to be made considering the nature of the transactions whereby the property was acquired and all surrounding circumstances. Fountain v. Maxim,290 Pac. 576 (Cal. Sup. Ct. 1930); Wilson v. United States,100 F.2d 552, 555 (9th Cir. 1938). When property has been purchased during marriage with commingled community and separate funds of the spouses, it is presumed to be community property. In re Marriage of Mix,536 Pac. 2d 479 (Cal. Sup. Ct. 1975); In re Freitas,16 F.Supp. 557, 559 (S.D. Cal. 1936). Based on the above legal principles, the record in this case clearly establishes that all the stocks and bonds owned by decedent and Mr. Ridenour at the date of decedent's death, whether in their joint accounts or in Mr. Ridenour's *199 separate account, were community property. The record shows a separation of property in 1964 when Mr. and Mrs. Ridenour were experiencing marital difficulties and the spouses began to live apart. The record shows that after approximately one year of living apart, no divorce or legal separation ever having been decreed, Mr. and Mrs. Ridenour resumed living together. The record shows no agreement between Mr. and Mrs. Ridenour with respect to the property they acquired during their short period of separation or when they resumed living together. The record shows that Mr. Ridenour continued, throughout the entire period, to support decedent and indicates a growing pattern of earnings after the Ridenours ceased to live apart. The presumption of the California law is clear that Mr. Ridenour's earnings when he and Mrs. Ridenour were living together during their marriage were community property and in our view his earnings during their short period of separation were also community property. In any event, this record does not show what portion of the stocks and bonds owned by the Ridenour's at the date of decedent's death were acquired with earnings of Mr. Ridenour after the termination *200 of their short separation.From the nature of his increasing earnings the inference is that a substantial part of these securities were acquired with such earnings. Also significant is the agreement between Mr. and Mrs. Ridenour made around the time or shortly before the opening of the two joint stock accounts that decedent and Mr. Ridenour would again convert all their property to community property. The testimony in regard to that agreement shows that Mrs. Ridenour was ill and, in Mr. Ridenour's words, "she wanted to put our money back together" and that he agreed to do so. Mr. Ridenour testified that it was because of his wife's condition that he made the agreement. The reason that Mr. Ridenour made the agreement with his wife is not controlling when he did in fact make the agreement and follow his making of the agreement by actions consistent therewith. The record is clear that he did agree to the request of Mrs. Ridenour that they put their money back together.Taken in context, in our view their agreement was to transmute any separate property of either to community property. Prior to their oral agreement in 1964 to separate their property, all their property was community *201 property. Therefore, to put their property back together could only mean to transmute their property to community property. Also, the actions of Mr. Ridenour and decedent after their agreement conforms with the treating of their property as community property. The record shows that funds were deposited in the joint bank account of the Ridenours after this agreement and that funds in this account were treated on the estate tax return as filed as community property. The record further shows that on June 7, 1967, the two joint brokerage accounts of the Ridenours were opened and on June 8 cash was deposited in the joint accounts which appears to have come from the joint bank account and shares of stock were deposited in those accounts which previously had been reported on the returns of Mr. and Mrs. Ridenour as separate property. The record shows that thereafter other deposits were made to these accounts. Later in 1967 over $ 72,000 taken from the account of California Equipment Rental Company, a partnership which had been formed by Mr. Ridenour and another individual in the latter part of 1966 after Mr. and Mrs. Ridenour had terminated their short separation, was deposited in the joint *202 bank account of Mr. and Mrs. Ridenour. Petitioner argues that this $ 72,000 was from the separate property taken by Mr. Ridenour in 1964. The weight of the evidence does not support this contention. However, even if this fact were established, the fact that the money was placed in the joint account of the Ridenours which they apparently considered as community property prior to being used to purchase stocks indicates conformance with the intent to transmute any separate property of the spouses to community property. Most of the stocks in Mr. Ridenour's separate accounts opened in November at a time when apparently Mrs. Ridenour had gone into a coma came from stocks in the joint accounts or funds from the joint bank account of Mr. and Mrs. Ridenour. Certainly, Mr. Ridenour could not transform community property into his separate property unilaterally while Mrs. Ridenour was unable to participate in any such decision because of being in a coma. Not only does the testimony as to the agreement of Mr. and Mrs. Ridenour that all their property become again community property support the fact that the stocks held either in the joint accounts or Mr. Ridenour's separate account at *203 the date of Mrs. Ridenour's death was community property but also Mr. Ridenour's actions thereafter supports this conclusion. On their joint 1967 income tax return the stocks owned by Mr. and Mrs. Ridenour were not designated in reporting dividends as being the separate property of either, as had been the case in 1965 and 1966, but rather the indication is that these stocks were considered to be held as community property. On the separate returns for 1968 filed by Mr. Ridenour for himself and his deceased wife, it is clearly indicated that all stocks and bonds owned by the Ridenours were community property. Also the fair inference from the affidavit signed by Mr. Ridenour for the purposes of California inheritance taxes is that all of the property owned by the Ridenours at the date of Mrs. Ridenour's death was community property. Particularly significant is the fact that this affidavit was signed in February 1969 after Mr. Ridenour's attorney had written a letter to the inheritance tax appraiser referring to his discussion with Mr. Ridenour which led him to the conclusion that all property of Mr. and Mrs. Ridenour which previously had been separate property had been returned to community *204 property status. The testimony of the attorney was that he had discussed the nature of the property owned by Mr. and Mrs. Ridenour with Mr. Ridenour before preparing this letter. Considering this record as a whole we conclude that the stocks and bonds owned at the date of Mrs. Ridenour's death whether held in the joint account of Mr. and Mrs. Ridenour or in Mr. Ridenour's separate account were community property of the Ridenours and that respondent properly increased the value of decedent's estate by her $ 71,972.45 community interest in these stocks and bonds. Petitioner contends that regardless of our conclusion as to whether the stocks and bonds owned by Mr. and Mrs. Ridenour at the date of Mrs. Ridenour's death were community property, respondent is estopped from introducing evidence to show an addition to tax for fraud in this case because of Mr. Ridenour's acquittal in the criminal fraud case. Petitioner recognizes that under the holding in Helvering v. Mitchell,303 U.S. 391 (1938), the Government is not estopped from showing that a part of an underpayment *205 of tax was due to fraud with intent to evade tax by an acquittal of the taxpayer in a prior criminal proceeding involving substantially the same items involved in the civil case. Petitioner, however, contends that the judge's decision in United States v. Ridenour, No. 74-1632F (CDE. Cal. 1975), held that there was in fact no intent to evade tax by Mr. Ridenour in the filing of decedent's estate tax return. The criminal case against Mr. Ridenour was disposed of without any written opinion of the court. We have set forth in full the statements of the court in holding Mr. Ridenour not guilty. In our view the only holding of the court in the prior criminal case was that the Government had failed to show beyond a reasonable doubt that Mr. Ridenour was guilty of fraud. We therefore conclude that respondent was not estopped from attempting to prove in this case that a part of the underpayment of estate tax was due to fraud on the part of the executor, Mr. Ridenour. Helvering v. Mitchell, supra.
Respondent takes the position that he has shown fraud in the filing of decedent's estate tax return by clear and convicing evidence. We have long recognized that *206 in order to establish fraud respondent must show by clear and convincing evidence an intentional wrongdoing by a taxpayer with intent to evade tax believed to be owing. Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). We have reviewed all the evidence in the record with particular reference to those items which might tend to show that Mr. Ridenour as executor knowingly omitted assets of Mrs. Ridenour's estate from the estate tax return with the fraudulent intent to evade taxes. While there are indications in the record that by December 1968 or early 1969 after the estate tax return had been filed Mr. Ridenour was aware that the stocks which were held either in the joint account or his separate account at the date of decedent's death were community property of the Ridenours, there is a great sparsity of evidence in this record to indicate that Mr. Ridenour was aware of this fact at the time the estate tax return was filed. Section 6653(b) provides that if any part of any underpayment of tax "required to be shown *207 on a return" is due to fraud, there shall be added to the tax the addition to tax for fraud.[8] In order for the underpayment of tax required to be shown on the return to be due to fraud, it must be shown that there was some omission of information from the return resulting in an underpayment and that the omission was made with the fraudulent intent to evade tax. See Rubinstein v. Commissioner,29 T.C. 861 (1958), affd. per curiam 264 F.2d 478 (3d Cir. 1959); Estate of Clarke v. Commissioner,54 T.C. 1149, 1163 (1970), and cases there cited. While there are some indications in the record that Mr. Ridenour should have been more careful in the information he furnished to the attorneys who were to prepare the estate tax return, in our view there is no clear and convincing evidence to show that Mr. Ridenour knowingly omitted assets from the estate tax return of decedent's estate. The record shows that Mr. Ridenour consulted attorneys with respect to the preparation of the estate tax return. It further shows that he furnished whatever information those attorneys asked for and that initially the attorneys thought that there was separate *208 property of the Ridenours at the date of Mrs. Ridenour's death. The estate tax return and the initial report to California for inheritance tax purposes was filed on this assumption. After the estate tax return was filed and in connection with the California inheritance tax report, one of the attorneys asked further questions of Mr. Ridenour and concluded that all the property held by Mr. and Mrs. Ridenour at the date of Mrs. Ridenour's death was community property. However, this was after the Federal estate tax return was filed. Although the attorney prepared and Mr. Ridenour filed another report to the State of California for inheritance tax purposes, there is no indication in the record that the attorney ever suggested to Mr. Ridenour that an amended estate tax return should be filed and the inference from the record is that the attorney never made such a suggestion to Mr. Ridenour or discussed the matter with him. *209 As stated above, in our view the stocks were community property. The assets with which the stocks were purchased were either assets which were community property because of being earnings of Mr. Ridenour while he and Mrs. Ridenour were living together or assets which had been transmuted to community property under the agreement of the parties if they ever had become separate property. We do not, however, consider it to be clear that Mr. Ridenour was aware of this fact at the time the estate tax return was filed. Most of the stocks had actually been transferred to Mr. Ridenour's separate account by the date of Mrs. Ridenour's death. Because at the time the estate tax return was filed Mr. Ridenour because of discussions with his lawyers thought that he and Mrs. Ridenour each had some separate property, the record is not clear that he knew at the time the return was filed that the stocks were not his separate property. The indication from the record is that neither of the attorneys who consulted with Mr. Ridenour ever asked him about any property owned at the date of Mrs. Ridenour's death that he considered his separate property. It appears that Mr. Ridenour was never advised that *210 an amended Federal estate tax return should be filed and it is far from clear that when Mr. Ridenour's attorney discussed with him the community property aspect of his and Mrs. Ridenour's assets for preparing an amended California inheritance tax report, that Mr. Ridenour connected his conclusion that all property held by him and decedent at the date of her death was community property with the assets which had been reported on the Federal estate tax return. Respondent makes much of the interview of Mr. Ridenour with the special agent and estate tax examiner in which Mr. Ridenour stated that he did not believe he owned any stocks at the date of Mrs. Ridenour's death. However, the very fact that he gave the name of the broker handling his account and his joint account with decedent at the time of decedent's death to the estate tax examiner mitigates against this statement being a deliberate misrepresentation. Respondent also called attention to the fact that at the trial of this case Mr. Ridenour testified that he had owned no stocks prior to the opening of the accounts with Morgan, Olmstead. We put little weight on this since there was in the record the tax returns of Mr. and *211 Mrs. Ridenour for 1965 and 1966 showing that they did own stock and also Mr. Ridenour's statement with respect to Mrs. Ridenour's ownership of stock of Life Insurance Investors Fund. On the basis of this record, we conclude that when Mr. Ridenour made the statement about the Morgan, Olmstead account he had in mind an active stock account such as he opened in June of 1967 rather than ownership of a small amount of stock. Considering this record as a whole, we conclude that the evidence is not clear and convincing that a part of the underpayment of tax reported on the estate tax return was due to fraud. The record here, however, is clear from the findings we have made that the value of the assets omitted from the gross estate reported on the return exceeds 25 percent of the value of the gross estate reported. Therefore, the provisions of section 6501(e) (2)[9] are applicable here. Even though the estate tax return was actually filed on November 20, 1968, under the provisions of section 6075 as in effect at the date of decedent's death, the return was due to be filed on or before June 7, 1969. Under the provisions of section 6501(b) (1), [10] for purposes of computing the time *212 provided in section 6501(e) (2), a return filed before the last date prescribed by law or by regulations shall be considered as filed on such last day. Therefore, for the purposes of section 6501(e) (2), the estate tax return is considered as filed on June 7, 1969. The deficiency notice in this case was mailed on June 3, 1975, which was within 6 years from the date of the filing of the return within the meaning of section 6501(e) (2). We therefore hold that the assessment and collection of whatever additional estate tax is determined to be due as a result of the opinion in this case is not barred by the statute of limitations.
*213 Petitioner made no argument concerning the inclusion in decedent's estate of the partnership account receivable and the brokerage accounts receivable. Apparently petitioner has abandoned any issue concerning these accounts. If it has not abandoned these issues, it has totally failed to show errors in respondent's determination with respect to these items. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Section 6075(a) prior to amendment by section 101(b), Pub. L. 91-614.↩
3. The 1965 "other income" loss consisted of a partnership loss of $ 5,872.57 which was reduced by $ 321.93 of dividend income, $ 1,178.98 of interest income and $ 650.12 of capital gain income. The 1966 and 1967 "other income" consisted of $ 23,912 and $ 39,246, respectively, of partnership income, the 1967 amount being designated as from California Equipment Rental. The balance of the "other income" in each of these years consisted of dividends, interest and net capital gains.↩
4. The items listed do not result in the exact total amount of income reported because "other income" was reduced by some claimed community property business expenses.↩
5. California Civil Code Section 5110 prior to a 1973 amendment provided, insofar as here pertinent, as follows: Sec. 5110. Community property; presumption as to property acquired by wife; limitation of actions; leasehold interests All other real property situated in this state and all other personal property wherever situated acquired during the marriage by a married person while domiciled in this state is community property; * * * ↩
6. California Civil Code sections 5118 and 5119 as effective at the date of decedent's death provided: Sec. 5118. Separate property; earnings of wife and children after separation The earnings and accumulations of the wife, and of her minor children living with her or in her custody, while she is living separate from her husband, are the separate property of the wife. Sec. 5119. Separate property; earnings after judicial separation or dissolution (a) After the rendition of a judgment or decree for separate maintenance, the earnings or accumulations of each party are the separate property of the party acquiring such earnings or accumulations. (b) After the rendition of an interlocutory judgment of divorce and while the parties are living separate and apart, the earnings and accumulations of the husband are the separate property of the husband. As amended by Stats. 1971, c. 1699, p. 3640, secs. 1 and 2, effective March 4, 1972, sections 5118 and 5119 of the California Code provide: Sec. 5118. Separate property; earnings of spouse and children after separation The earnings and accumulations of * * * a spouse and * * * the minor children living with * * * or in * * * the custody of,the spouse, while * * * living separate andapart from * * * the other spouse, are the separate property of the * * * spouse.
Sec. 5119. Separate property; earnings after judicial separation * * * After the rendition of a judgment decreeing legal separation of the parties, the earnings or accumulations of each party are the separate earnings or accumulations. * * * In the case of In re Marriage of Bouquet,546 Pac.2d 1371 (Calif. Sup. Ct. 1976), it was held that where a divorce action had been filed but a final decree not entered on March 4, 1972, the effective date of the amendment of section 5118, that section as amended would be retroactively applied. In this respect the Court stated (at 1378): In sum, we hold that amended section 5118 governs all property rights, whenever acquired, that have not been finally adjudicated by a judgment from which the time to appeal has lapsed. Under the holding of In re Marriage of Bouquet,supra, we would conclude that the law in effect at the date of the death of a spouse would govern rather than a retroactive amendment passed after the spouse's death. We would equate a spouse's death prior to March 4, 1972, to a final judgment of divorce or separation prior to that date. However, since the period of separation of Mr. Ridenour and decedent in this case was of relatively short duration, whether former section 5118↩ or that section as amended is applicable, has no effect on our conclusion in this case.
7. Section 5104 of the California Civil Code provides: Sec. 5104. Methods of holding property A husband and wife may hold property as joint tenants, tenants in common, or as community property.↩
8. SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
9. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(e) Substantial Omission of Items. --Except as otherwise provided in subsection (c)-- (2) Estate and gift taxes.--In the case of a return of estate tax under chapter 11 or a return of gift tax under chapter 12, if the taxpayer omits from the gross estate or from the total amount of the gifts made during the year for which the return was filed items includible in such gross estate or such total gifts, as the case may be, as exceed in amount 25 percent of the gross estate stated in the return or the total amount of gifts stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. In determining the items omitted from the gross estate or the total gifts, there shall not be taken into account any item which is omitted from the gross estate or from the total gifts stated in the return if such item is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item. ↩
10. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(b) Time Return Deemed Filed.-- (1) Early return.--For purposes of this section, a return of tax imposed by this title, except tax imposed by chapter 3, 21, or 24, filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩